**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

T. D. BINGHAM, aka Seal B; Bull;
Tyler Davis Bingham; The Hulk,
          *Defendant-Appellant.*

No. 06-50668

D.C. No.
CR-02-00938-
DOC-2

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

EDGAR WESLEY HEVLE, aka Seal R;
Snail,
          *Defendant-Appellant.*

No. 06-50669

D.C. No.
CR-02-00938-
DOC-18

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted
March 8, 2011—Pasadena, California

Filed August 4, 2011

Before: Pamela Ann Rymer, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Rymer

10133

---

**COUNSEL**

William S. Harris, Law Offices of William S. Harris, South Pasadena, California, for defendant-appellant T.D. Bingham.

Bernard J. Rosen, Law Offices of Bernard J. Rosen, Beverly Hills, California, for defendant-appellant Edgar Wesley Hevle.

Stephen G. Wolfe, Assistant United States Attorney, Los Angeles, California, (argued); Joey L. Blanch, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

---

**OPINION**

RYMER, Circuit Judge:

Tyler Davis Bingham and Edgar Hevle are members of the Aryan Brotherhood prison gang and were convicted following trial by a jury of substantive violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c), conspiracy to violate the RICO Act, 18 U.S.C. § 1962(d), the murders of Frank Joyner and Abdul Salaam as violent crimes in aid of racketeering (VICAR), 18 U.S.C. § 1959(a)(1), and the murder of Arva Lee Ray, 18 U.S.C. § 1111. Bingham and Hevle appeal their convictions, and we affirm.

# I

## A

The Aryan Brotherhood (AB) started as a California state prison gang and eventually spread to the federal system. AB members were incarcerated at the United States Prisons in Lompoc, California; Florence, Colorado; Marion, Illinois; Leavenworth, Kansas; and Lewisburg, Pennsylvania.

Through the 1980's, the AB had an informal structure of command. AB members elected a three-person Council with limited oversight capabilities, meant to act more as coordinators than leaders. The Council's main role was to "pass messages" and keep track of members, but over the years it got more authority to make decisions. Barry Byron Mills, Edgar Hevle, and Tommy Silverstein were on the first Council, with T.D. Bingham joining later.

In 1992-1993, the AB replaced the Council with a more powerful three-person Commission. The Council still existed, but now was appointed by and subordinate to the Commission. The Commission's written mission statement indicated that it sought to "transform [the AB] from a disfunctional [sic] prison gang into a viable and productive criminal organization inside prison and on the streets."

Mills, Bingham, and Al Benton were the three AB commissioners at the time of most of the events in this case. By majority vote, they could authorize any major decision for the AB, such as ordering a hit on an AB member or going to war against another prison gang. The Commission oversees the organization, the Council implements the Commission's programs, and lower level members carry out logistical tasks. At each prison, one member (preferably a Council member) is in charge of AB affairs and reports directly to the Commission.

The AB's two main goals are to control, dominate, and influence the prison system so that its members can have an

"easy time" while incarcerated; and to operate criminal enterprises, such as computer fraud, identity theft, extortion, prostitution, gambling, and drug trafficking. The AB does not hesitate to kill its enemies (or even its own members if they disobey orders) to accomplish these goals. When the AB orders a murder, AB members are supposed to "like a piranha . . . come out and fight irregardless of whether it's bad odds or not."

For new members, the AB has a policy of "blood in, blood out": potential members must commit a murder to gain full membership, and can only leave when they die.[1] AB members also must support other AB "brothers," may not assault other brothers without permission, must split drug profits evenly, and may not cooperate with law enforcement. Violating any of these policies could get an AB member killed, though a kill order could only come from the AB Commission. Conversely, "[i]f someone assaulted an Aryan Brotherhood member, other Aryan Brotherhood members were supposed to kill them at any cost." Prisoners indicate their status as AB members through the use of symbols, such as an Irish shamrock, the letters AB, or the number 666.

## B

Arva Ray was a member of the Aryan Brotherhood incarcerated at Lompoc. He openly maintained a homosexual relationship, mishandled drugs, and disrespected AB brothers — all against AB rules. Hevle disliked Ray and told Thomas Miller, who testified, that Ray's relationship "looked bad" for the AB.

The Commission ordered Phil Myers to organize Ray's murder. Myers promised Glenn Filkins, who was not yet a member, that he would gain full AB membership if he mur-

---

[1]The "blood in" requirement was eventually relaxed to where new recruits only "had to show a willingness to kill."

dered Ray. The AB members at Lompoc, including Hevle, initially planned to kill Ray with rat poison, but decided against this after rat poison failed to kill another target, inmate Jeffrey Barnett. Instead, the AB decided to have Filkins kill Ray by injecting him with an overdose of heroin. When the AB delayed in killing Ray, Hevle sent a message asking what the holdup was.

Filkins and Miller carried out the murder on August 9, 1989. When Ray did not die immediately from the heroin, Filkins strangled him with a garrote wire while Miller held him down. After the murder, Filkins told Miller that he had been admitted to the AB and showed Miller a shamrock ring — made in the prison dental lab and commissioned by the AB — as evidence of his AB membership.

## C

In a dispute over a drug debt, the Latin Kings prison gang attacked AB associate Red Lollar. In retaliation, Bingham ordered prospective AB member Steve Scott to attack Latin Kings member Ismael Benitez-Mendez at Leavenworth.

On January 4, 1992, Officer William Halpin saw Benitez-Mendez running away from a prisoner who was armed with a knife. The armed prisoner wore a watch cap, green fatigue shirt, and khaki pants. Halpin called for help as both inmates ran away.

Prison officers were able to locate both the weapon used in the assault and Benitez-Mendez, who had suffered knife wounds to his back and hand. While searching the surrounding cells, officers found inmate Ernest Martinez wearing blood-stained khaki pants; a green fatigue shirt lay nearby. Officers also found two blood-stained brown paper towels in the cell of Anthony Cruz and Edmund Gonzalez; Gonzalez had a cut on his finger. That evening, the officers placed the

pants, shirt, and paper towels, along with other evidence, in a locker for storage.

On January 4, five Hispanic inmates, including Ernest Martinez, were placed in the hole,[2] pending an investigation. They were released back into the general population the next month. Meanwhile, prison officers decided on January 7 to place Bingham, Steve Scott, and two other prisoners in the hole. When the officers examined Scott, they discovered a fresh "666" tattoo on the left side of his chest.

After investigation, prison officials determined that the paper towels, pants, and shirt were unrelated to the attempted murder. On August 12, 1992, those items were destroyed.

D

In December of 1996, at Lewisburg, the DC Blacks prison gang killed a white inmate. After this murder, Hevle gave a message to Dewey Lee, a prisoner transferring from Lewisburg to Marion, "to tell either Dave [Sahakian] or [Michael McElhiney], specifically, nobody else, that they'd been having racial problems at USP Lewisburg and to get ready." Lee understood the phrase "to get ready" to mean start making knives and organizing AB members. Lee delivered the message sometime after January 2, 1997.

On January 2, 1997, about a dozen members of the DC Blacks attacked six white inmates at Marion. The AB members at Marion met and decided to "move on" and "kill whatever DC Blacks and associates we could." Michael Wagner, an AB member, was transferred by prison officials from Marion to the supermax prison at Florence to prevent Wagner from assaulting any DC Blacks. When transferred, Wagner

---

[2]"The hole" refers to the Secure Housing Unit (SHU) where inmates are confined to their cells for 23 hours a day. It is also referred to as "being locked up."

delivered several messages to commissioner Mills, including a message that "there was a war" at Marion. Even though Wagner was in the hole, he was able to communicate with Mills by speaking through a system of drainage pipes that connected the two of them.

Mills responded that he would "see what's going on, work this out," and told Wagner not to make any moves. Both Mills and Bingham were housed at Florence and, as a majority of the AB Commission, could approve a war with the DC Blacks. If they authorized a war, Mills would signal AB members by using the phrase "It's a (baby) boy"; if the war were called off, then Mills would use the phrase "It's a (baby) girl." In the summer of 1997, Mills wrote that he "still don't know for certain yet whether the baby is a boy or a girl, but we're hoping for a girl, while preparing for either." In the event of war, the AB wanted it to be nationwide so that they could "kill as many as we could as quick as we could."

At some point, Mills learned that the DC Blacks at Marion had put hits on Dave Sahakian and Michael McElhiney. Mills sent a message to Bingham, via AB member Chris Risk, telling him "The Toads put a hit on Dave and Mac — The war is on — Let Lewisburg know." Bingham received Mills's message on August 14, 1997. After Chris Risk confirmed it was from Mills, Bingham wrote an invisible-ink message to Lewisburg, where Al Benton and other AB members were housed, telling them "War with DC Blacks /s/ T.D." Bingham gave Ronald Slocum the message "[t]o send it to Lewisburg, to move on the DC Blacks."

On August 17, after being pressured by Jonathan McGinley to make sure that everyone was "on the same page," Bingham wrote back to Mills to confirm the war was on. Bingham enlisted McGinley to write a letter containing two coded messages. The first was in the body of the letter, where Bingham wrote "I am a grandfather, at last my boys [sic] wife gave birth to a strapping eight pound seven ounce baby boy." The

quantities mentioned ("a," "8," and "7") refer to California Penal Code § 187 and the crime of murder. The second coded message involved the letter itself, written in a cipher system using cursive and printed characters. De-ciphering the text reveals: "Confirm message from Chris to move on DC." Bingham also authorized attacks within his prison at Florence. He told AB members Eugene Bentley and Kevin Roach to kill DC Blacks Hollywood Smith and Clarence Hinnitt.[3]

Slocum delivered Bingham's "War with DC Blacks" message to Benton on August 27 at Lewisburg. Benton understood the message to mean "Kill 'em as soon as possible. . . . 'We're at war.' "[4] However, Benton wanted to verify the cause of the war — that the DC Blacks had hit two AB members at Marion — so he called Ronald Slocum. Slocum was unable to do so.

---

[3]Bingham's message to Roach read:

> D.C. Blacks put hits on Brothers — Marion. Uneffective as yet. Some D.C./A.D.X. declare war on Wolfpack. Commission deems threat serious. Orders — Lethal Counteraction. Coordinating multiple/simultaneous action. Your unit make preparations. Target Beady. Launch time still undetermined. Will notify. Prepare and hold. Awaiting confirmation.

[4]Benton's testimony shows that he had no doubts about what Bingham intended to communicate:

> A. . . . I didn't believe that we were going to war, I mean, the circumstances for the war, in my own heart. But that's not how it works. The Commission, out of the three people, two people make the vote. I have got no say in the thing. If one of the other Commission members said no and I said no, then there's no war. It takes two to three. So war was called. I got the letter. War is already called. It wasn't a letter asking me my opinion.
>
> Q. So that letter mean that—
>
> A. Go to war.
>
> Q. —that Defendant—
>
> A. It meant kill every black you can find. That's exactly what it meant.

On August 28, 1997, AB members led by Al Benton murdered Frank Joyner and Abdul Salaam and stabbed Byron Ball. Before the murders, Benton promoted Jason Schwyhart and Henry Houston from probationary members of the AB to full members because "they were going to sacrifice themselves" by "catching a case." Benton explained that "if you are going to try to kill as many people as you can, you know you are going to catch . . . a murder case in Pennsylvania."

Byron Ball was playing a game of Monopoly with Larry Fortune and Frank Joyner when the attacks took place. Wayne Bridgewater entered the cell where the three were playing and repeatedly stabbed Joyner with a knife. Ball stepped away from Bridgewater, toward the door of the cell, and pleaded with Bridgewater to stop. Ball then noticed Schwyhart walking towards him, so Ball turned his body into the cell to let Schwyhart pass by. As he turned back, Ball "felt something hit my shoulder" and "my right arm started feeling funny." Ball saw blood dripping from his arm and went back to his cell, where he tried to wrap a make-shift tourniquet around his arm. Ball "later found out that [he] had been stabbed in such a way that tying this like a tourniquet on didn't do any good whatsoever. Because [he] had been stabbed in the back this way through the shoulder, took a piece of the armpit off under my arm and a piece of the upside of my shoulder."

Because Houston did not know by sight who he was supposed to kill, Benton escorted him to Abdul Salaam's cell. They stabbed Salaam to death at the same time as the Joyner and Ball attacks.

Back at Florence, the planned murders of Hollywood Smith and Clarence Hinnitt never occurred because prison officials preemptively placed all AB members in the hole to prevent a Lewisburg-style attack. While in the hole, Kevin Roach asked Bingham if he knew "exactly what was behind the Lewisburg murders so that [Mills] would know whether to make the war official or not." Bingham responded, "hell yes, he had given

the order. He had given the word for the hits at Lewisburg and to let Barry [Mills] know that it was on everywhere. . . . That every [AB] member was to kill any DC Black that they could."

E

In 2002, a grand jury returned a ten-count indictment that charged 40 defendants with committing RICO crimes as part of their involvement with the AB. Bingham was charged with a substantive RICO offense (Count 1), a RICO conspiracy offense (Count 2), conspiring and aiding-and-abetting in the VICAR murder of Frank Joyner (Count 6), conspiring and aiding-and-abetting in the VICAR murder of Abdul Salaam (Count 7), the murder of Arva Ray (Count 9), and the murder of William McKinney (Count 10). Hevle was charged with a RICO conspiracy offense (Count 2), conspiring and aiding-and-abetting in the VICAR murder of Frank Joyner (Count 6), conspiring and aiding-and-abetting in the VICAR murder of Abdul Salaam (Count 7), and the murder of Arva Ray (Count 9).

As part of the substantive RICO offense, Bingham was charged with the racketeering acts of conspiracy and murder of Arva Ray, conspiracy and attempted murder of Ismael Benitez-Mendez, conspiracy and murder of William McKinney, conspiracy to murder black inmates, the Joyner murder, the Salaam murder, and the attempted murder of Byron Ball.

After a five-month trial, the jury convicted Bingham of all charges against him, except for the murder of William McKinney. In a special verdict, the jury found that Bingham was guilty of all racketeering acts alleged against him, except for the conspiracy and murder of William McKinney. The jury also found that Bingham had agreed to at least one act involving murder and one act involving drug trafficking to support his RICO conspiracy conviction. The jury convicted Hevle of all charges against him and, to support the RICO

conspiracy conviction, found that Hevle had agreed to two acts involving murder. Bingham and Hevle were sentenced to life in prison.

Both timely appeal their convictions.

II

A

Bingham claims that there is insufficient evidence to convict him of the VICAR murders of Joyner and Salaam because his message to Benton telling him there was "War with the DC Blacks" could only be understood as a warning. In support, Bingham points to evidence that Lewisburg was a dangerous place for AB members and he was just trying to alert Benton to this fact; that his message to Lewisburg, on August 14, came before his confirmation to Mills on August 17; that the cover text of his letter to Mills had no independent significance; that Benton's phone conversations with Slocum show Benton's misunderstanding of Bingham's message; that no DC Blacks outside of Lewisburg were murdered; and that the message to Roach was a warning because it included the phrase "prepare and hold."

[1] "Evidence is sufficient if, viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Odom*, 329 F.3d 1032, 1034 (9th Cir. 2003). Here, a rational juror could have found that Bingham took steps to aid and abet the murders of Joyner and Salaam. He told Benton to go to war, and Benton did. Bingham's alternative explanations are countered by the government's evidence, which the jury was entitled to accept and which we must assume that it did. For example, Jonathan McGinley testified that Bingham initially interpreted Mills's message as a clear declaration of war and only sent the coded letter asking for confirmation at McGinley's insistence; Bentley testified

that Bingham told him the message was meant "to kill DC Blacks." There was evidence that the coded text meant to murder ("187") and go to war ("baby boy"), showing Bingham's interpretation of Mills's message. Benton's ambiguous conversations with Slocum can show caution about prison officials monitoring the phone call as well as confusion about mission. The fact that no DC Blacks outside of Lewisburg were murdered does not connote the absence of evidence in support of the verdict given evidence that AB members elsewhere were put in the hole to avert another Lewisburg-style attack. And Bingham's note to Roach that ordered him to "prepare and hold" can reasonably be read in context of the order as a whole, which is captioned "Orders — Lethal Counteraction," to wait for "launch time" which was "still undetermined." The evidence is sufficient to support Bingham's convictions under aiding-and-abetting or co-conspirator liability.

B

Bingham also maintains that his conviction for a substantive RICO offense under 18 U.S.C. § 1962(c) cannot stand, primarily on account of insufficiency of the evidence. His theory is that restructuring the AB in 1993 created a new criminal enterprise and acts that occurred before 1993, such as the Ray murder and attempted murder of Benitez-Mendez, cannot be related to acts that occurred after. In Bingham's view, those two murders are not related to each other, either.

**[2]** To convict, the evidence must show that Bingham was engaged in a "pattern of racketeering activity," that is, at least two acts of racketeering activity, with the last act coming in the last 10 years. 18 U.S.C. § 1961(5). These acts must be related to each other and must "pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Racketeering acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by dis-

tinguishing characteristics and are not isolated events." *Id.* at 240 (quotations omitted).[5] Because Bingham does not challenge his conviction for one of the predicate acts charged (Racketeering Act 37, conspiracy to Murder Black Inmates), we must affirm his substantive RICO conviction if we uphold at least one additional predicate act that is related to Racketeering Act 37. *See id.* at 237.

**[3]** The particular structure under which the AB operated at the time of the various predicate acts is not determinative of the relatedness of those acts. As the Supreme Court recently held, a RICO enterprise "need not have a hierarchical structure or a 'chain of command.' " *Boyle v. United States*, 129 S. Ct. 2237, 2245 (2009). The enterprise does not need a formalized decision-making method, nor must it assign members specific roles and duties. *Id.* "[A] group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 2246. In short, the AB must only have had "some sort of framework, formal or informal, for carrying out its objectives" and members who worked as a "continuing unit to achieve a common purpose." *Id.* at 2247 (internal quotations omitted). So long as it had such a framework, the AB need not have employed any particular structure, or the same structure, to be a continuing unit with common purpose.

**[4]** There was evidence that, throughout the span of Bingham's racketeering acts, the AB had a framework for carrying out its objectives and its members worked as a continuing unit to achieve a common purpose. Before 1993, the AB had a leadership structure based around the Council. After

---

[5]Bingham relies on the Second Circuit's description of the relatedness requirement as having a "horizontal" and "vertical" component. *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (per curium). We have not adopted this precise formulation, but it would not matter here given that both components are satisfied by evidence that each predicate act is related to the activities of the criminal enterprise. *Id.*

1993, this structure was replaced by a three-man Commission, which oversaw the general direction of the AB, and subordinate levels of organization, including those who were to call the shots at the prison level. While these changes formalized the AB's hierarchy, they did not modify the AB's existence or its purpose or membership.

The AB pursued the same criminal goals both before and after the restructuring. It sought to control and dominate the prison system for its own benefit by killing those who attacked its members or disparaged its image. It also operated various criminal schemes involving prostitution, theft, extortion, gambling, and drugs. Nothing in the 1993 restructuring changed these goals.

Nor did the restructuring change any aspects or requirements of AB membership; it only codified the process of admitting new members and swearing them in. AB members still joined by invitation only, were to murder others when told to, and had to kill or attempt to kill targets in order to gain membership. AB members were to comply with all AB orders or risk being killed as punishment, both before and after 1993. And AB members continued using coded messages to organize crimes and making knives to carry out assaults and murders.

[5] Thus, a rational juror could find beyond a reasonable doubt that the AB remained the same criminal enterprise and the acts pre- and post-1993 were not insufficiently related. For the same reasons, because the AB continued as the same enterprise, the government did not constructively amend the indictment by telling the jury it could convict Bingham for RICO conspiracy (Count 2) on post-1993 evidence alone. *See United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (constructive amendment occurs when the "complex of facts presented at trial [are] distinctly different from those set forth in the charging instrument" or when "the crime charged in the

indictment was substantially altered at trial") (alterations omitted).

[6] Likewise, the jury could find the requisite relatedness connecting the Ray and Benitez-Mendez murders. Testimony by a number of former AB members showed that Ray was a member who flaunted the rules by, among other things, engaging in an openly homosexual relationship, disrespecting other AB members, and using drugs excessively without sharing. The jury could find that the Commission — including Bingham — ordered his death for these reasons, and that Filkins was ordered to kill him to gain membership. Benitez-Mendez had assaulted AB associate Red Lollar, which triggered the AB policy to mark him for death. Bingham (at the time the shot-caller at Leavenworth as well as a member of the pre-restructuring Council) ordered Scott to kill him, which he tried to do by obtaining a knife, sneaking up behind Benitez-Mendez in a stairwell, and stabbing him in the back. Eugene Bentley testified that afterwards, Scott hid in Bentley's cell, and he and other former members testified that Bingham said he had ordered Scott to kill Benitez-Mendez because Benitez-Mendez had disrespected the AB by assaulting Lollar. Accordingly, a rational juror could find that the two acts were related in purpose, result, participants, and methods of commission, telegraphing to the prison population that the AB maintained control by keeping its own members in line and protecting them from others.

C

Bingham further submits that there is insufficient evidence to support his convictions as an accomplice to the murders of Frank Joyner and Abdul Salaam, and the attempted murder of Byron Ball. However, as we have explained, there was evidence from which the jury could rationally find that Bingham sent an order to go to war with the DC Blacks that resulted in AB members' attacks on Joyner, Salaam, and Ball.

D

**[7]** Finally, Bingham claims that it is legally impossible to classify Schwyhart's attack on Byron Ball as an attempted murder because it only rises to the level of assault. Under Pennsylvania law, a person commits attempted murder when, with specific intent to kill, he takes a substantial step towards killing the victim. *Commonwealth v. Blakeney*, 946 A.2d 645, 652 (Pa. 2008). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before actual commission of the crime." *Commonwealth v. Gilliam*, 417 A.2d 1203, 1205 (Pa. Super. Ct. 1980). Stabbing a victim in the chest qualifies as a substantial step for attempted murder. *See Blakeney*, 946 A.2d at 652. Here, Jason Schwyhart stabbed Ball in the back, through his shoulder, and out the armpit, in such a way that a tourniquet could not apply pressure to the recessed wound. A jury could reasonably conclude that Schwyhart took a substantial step to kill Ball.

**[8]** While Bingham claims that Schwyhart did not intend to kill Ball because he was not a DC Black, there is substantial evidence that the AB meant to kill black inmates generally.[6] Schwyhart could also plausibly have mistaken Ball for a DC Blacks member or associate, as Ball was in Frank Joyner's cell and pleading with Bridgewater to stop his attack. There is sufficient evidence to support the jury's finding of an intent

---

[6]For example, there was testimony that:

"[A]ny black man who raised his hand to a white man, we hit him. He dies."

"The goal was to kill whatever DC Black and associates we could."

"[A] full, black-and-white race war."

"It meant kill every black you can find. That's exactly what it meant."

to kill, and sufficient evidence to support Bingham's substantive RICO conviction.

III

A

**[9]** Bingham argues that he was convicted of conspiracy to murder and attempted murder of Benitez-Mendez (Racketeering Act 9) in violation of due process because prison officers destroyed the bloody pants found on a Hispanic inmate after the attempted murder. This evidence was facially exculpatory to Bingham because it implicated a non-AB member as the attacker. But to be a constitutional violation, the destroyed evidence must also "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

**[10]** There was comparable evidence in this case. Officer Del Muro testified that he found inmate Martinez wearing blood-stained pants right after the attack on Benitez-Mendez. The parties also stipulated to the fact that "inmate Ernest Martinez . . . was found to be wearing blood-stained khaki pants." The fact that the bloody pants existed was proven at trial by comparable evidence; Bingham was not denied due process. While the bloody pants possessed additional exculpatory value in that they could be tested for DNA, as Bingham notes on appeal, there is no indication that they were destroyed in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 56-58 & n.* (1988) ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."); *United States v. Sherlock*, 962 F.2d 1349, 1355 (9th Cir. 1992). Bingham has made no such showing.

## B

The government's case against Bingham for the murder of Arva Ray centered largely on the testimony of Thomas Miller, who helped Glenn Filkins murder Ray. Miller testified that Filkins was an AB prospect who sought full membership; the only way to become an AB member was "to kill someone or at least make a valiant effort." Miller stated that Filkins received an order from the Council (Mills and Bingham) to kill Arva Ray. After the murder, Filkins told Miller that the AB had made him a full member and showed him a ring engraved with a shamrock as proof.

Bingham argues that Miller's testimony was false and that the government knew it was when it put Miller on the stand. If so, this would constitute a due process violation under *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264 (1959). To prevail on a false testimony claim, the defendant must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). We review Bingham's claim for plain error because he did not object at trial. *United States v. Romero-Avila*, 210 F.3d 1017, 1021-22 (9th Cir. 2000).

Miller testified on direct that Filkins did not wear the shamrock ring until after Ray's murder. On cross-examination, defense counsel brought out a statement Miller made in 1994 that Filkins had been wearing the ring a month before Ray's murder, suggesting that Filkins did not need to murder Ray to gain AB membership. Miller responded that he did not recall saying this, but conceded that it was "very possible" he had.

**[11]** We "cannot presume that the prosecutor knew that the prior [inconsistent] statement was true" but elicited perjured testimony anyway, *United States v. Baker*, 850 F.2d 1365,

1371 (9th Cir. 1988), and Bingham points to nothing in the record that shows the intentional use of perjured testimony. Certainly Miller made inconsistent statements, but that is not enough for a *Napue* violation. *See United States v. Williams*, 547 F.3d 1187, 1202 n.13 (9th Cir. 2008) ("Although there were inconsistencies in Penate's testimony, there was no evidence that the government knowingly presented false testimony. . . . The inconsistencies in Penate's testimony were argued to the jury.").

**[12]** Bingham also contends that Miller lied about his involvement in the murder of William McKinney. However, there is no evidence that Miller lied or made inconsistent statements, and in any event Bingham was acquitted of McKinney's murder. Moreover, we have no reason to believe that Bingham's conviction is unworthy of confidence. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005).

IV

Hevle maintains that his conviction for the murder of Arva Ray cannot stand because the testimony against him was fabricated and inherently improbable. We review for sufficiency of the evidence, and "[a]bsent facial incredibility, it is not our role to question the jury's assessment of witness credibility." *United States v. Tam*, 240 F.3d 797, 806 (9th Cir. 2001).

**[13]** While we may disregard inherently improbable testimony, *United States v. Ramos-Rascon*, 8 F.3d 704, 708 n.3 (9th Cir. 1993), none of the testimony against Hevle was inherently improbable. Thomas Miller testified that the AB, including Hevle, decided to murder Ray with a heroin overdose rather than rat poison because rat poison had failed to kill Jeffrey Barnett. On cross-examination, the defense introduced prison housing records to show that Barnett's poisoning occurred at least seven weeks after Ray's murder. While this indicates that AB members could not have discussed the failure of rat poison to kill Barnett while planning how to kill

Ray, it does not make it "inherently improbable" that Hevle took part in a plan to murder Ray.

Michael Manby testified that, prior to Ray's murder, Hevle and Phil Myers complained that Ray was not "giving the right percent on the drugs [to the AB] and his homosexual activities" did not help the situation. They concluded that if Ray's conduct did not change, "he would be in big trouble." Several weeks after the Ray murder, Hevle and Myers told Manby that "they have a necktie man, and the necktie man can make a necktie big enough for [Manby]." This referred to new AB member Glenn Filkins, who murdered Ray by strangling him with a garrotte wire. Manby also testified that Filkins, who later became his cellmate, admitted killing Ray based on orders from Myers and Hevle.

Hevle contends that the conversation about the "necktie man" could not have taken place because Hevle was in the hole at that time. While prison housing records indicate that this was probably true, being in the hole did not render Hevle incapable of communicating with fellow AB members. Prisoners in the hole are still allowed one hour a day in a recreation cage. It was during this time in the rec cages that Eugene Bentley spoke with Mills and Kevin Roach spoke with Bingham. Prisoners could also communicate with each other across the rec yard by using sign language or speaking through a system of drainage pipes. AB members also snuck messages hidden in peanut shells to prisoners in the hole, who then responded by performing a specific number of push-ups or sit-ups, which were visible to the sender on the prison's closed circuit TV. Based on this evidence, and drawing all inferences in the government's favor, it is not inherently improbable to believe that Manby had a conversation with Hevle and Myers while they were in the hole.

[14] Hevle contends that William Kelly's testimony — that before Ray's murder, Phil Myers told him about a message that came out of the hole, asking "what's going on? Why

isn't Baby Ray took care of?" — is fabricated because it was not included in the government's summaries of interviews with Kelly and is impugned by Kelly's further testimony that Hevle was "locked up . . . [in] the hole" at this time. The jury heard this impeaching evidence and was able to evaluate it for what it was worth. Hevle also complains about testimony by Glen West concerning the murder of William McKinney, but Hevle was not convicted on the McKinney charges and the inconsistencies he points to do not relate to any other charges. Considering all of the testimony in the light most favorable to the government, there was sufficient evidence to support Hevle's conviction.

V

At the end of the government's case, Hevle renewed a motion to dismiss all charges against him for insufficiency of the evidence. The district court granted it in part as to the VICAR murders of Frank Joyner and Abdul Salaam, reasoning that Hevle could not be convicted on an aiding-and-abetting theory because the intervening facts between Hevle's message telling Marion "to get ready" and the Lewisburg murders rendered the murders too remote to be considered within the natural and probable consequences of Hevle's having sent the message. However, the district court declined to dismiss these murder charges in their entirety, for it concluded that Hevle could be convicted on a *Pinkerton* theory of liability. *Pinkerton v. United States* 328 U.S. 640, 646-48 (1946).

**[15]** Under *Pinkerton*, Hevle would be guilty if (1) he were a member of the conspiracy at the time of the murders,[7] (2) and another member of the conspiracy (3) killed Joyner and Salaam (4) in furtherance of the conspiracy, (5) and the murders fell within the scope of the unlawful agreement and

---

[7]The district court found that there was sufficient evidence that Hevle was a member of a conspiracy to violate RICO by virtue of his participation and leadership in the Aryan Brotherhood.

"could reasonably have been foreseen to be a necessary or natural consequence" of the conspiracy. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1202-03 (9th Cir. 2000). The district court recognized that "it appears inconsistent" for the Lewisburg murders to be a "necessary or natural consequence of the unlawful agreement" when it had just ruled that the murders could not be a "necessary or probable consequence of Hevle's act of sending the message." Yet, it explained, aiding-and-abetting foreseeability focuses on the act, while *Pinkerton* foreseeability focuses on the overall conspiracy. Thus, in the district court's view, when "the act is quite narrow, but the conspiracy is broad and sweeping, different results are to be expected."

**[16]** We agree with the district court, that aiding-and-abetting liability differs from *Pinkerton* liability. *United States v. Hernandez-Orellana*, 539 F.3d 994, 1006-07 (9th Cir. 2008) (contrasting an aiding-and-abetting charge with a "broader" criminal conspiracy charge); *United States v. Nakai*, 413 F.3d 1019, 1023 (9th Cir. 2005) (*Pinkerton* liability "broadens a defendant's liability beyond the aiding and abetting charge"). "[*Pinkerton*] renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not." *Hernandez-Orellana*, 539 F.3d at 1007. Although *Pinkerton* liability is limited by due process and does not reach defendants with extremely minor roles in the conspiracy, that is not the case here. Cases in which we have held that *Pinkerton* liability does not attach are quite different. For instance, in *United States v. Castaneda*, the defendant was the wife of a high-level drug dealer who "answer[ed] her home phone, [took] messages from callers and answer[ed] [her husband's] questions when he called." 9 F.3d 761, 767 (9th Cir. 1993) *overruled on other grounds*, *United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000). There was no evidence that she knew of the specific drug deals at issue, knew how the drug distributing organization worked, or knew that there was a

need for firearms given the "high-level import and distribution operation of the Castaneda clan." *Id.* at 766-68. In these circumstances, we declined to uphold her conviction for carrying a firearm during a drug trafficking crime. *Id.* at 768.

Similarly, we have held that mere gang membership "cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs." *United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998). But in *Garcia*, unlike this case, the government failed to prove the existence of an agreement among the defendant and Bloods gang members to shoot members of the Crips gang. *Id.* at 1246-47. Accordingly, the "general practice of supporting one another in fights" was insufficient to show that Garcia and his fellow Bloods conspired to assault rival gang members with deadly weapons. *Id.* at 1247.

**[17]** Unlike Leticia Castaneda — whose only connection to the firearm offenses was being married to one of the conspirators — Hevle was substantially involved in the AB. Hevle had been a member of the AB since the early 1980s and served in a leadership position on the Council for two years. He was also an active participant in organizing violence pursuant to AB rules. He helped plan Arva Ray's murder after Ray violated AB rules, and he told AB members at Marion to make knives and organize themselves to attack the rival DC Blacks gang. Hevle's role was neither minor nor marginal; given it, he could reasonably foresee that a co-conspirator might commit murder in furtherance of the conspiracy.

And unlike the Bloods gang in *Garcia* —whose members merely agreed to "back one another up in fights" — the AB had a policy of attacking and murdering rival gang members and killing any AB members who obstructed this policy. The AB was initially formed in the 1960s as a counterforce to rival black and Hispanic prison gangs. AB members Clifford Smith and Michael Wagner testified that the AB had previously gone to war with the Nuestra Familia, Black Guerilla

Family, and DC Blacks prison gangs. AB member Glen West testified that giving knives to a rival gang was punishable by death, "because we don't want to arm somebody that could be coming after us later." Kevin Roach stated that the AB placed its enemies on hit lists and that "any brother that ran across [an enemy] was supposed to take care of him." The AB considered the DC Blacks to be enemies as early as 1991. Thus, the murders of Joyner and Salaam could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 646-48.

**[18]** Based on the same evidence that renders Hevle liable as a *Pinkerton* co-conspirator for the Joyner and Salaam murders, the jury could also find him guilty of RICO conspiracy for agreeing to two acts involving murder.

## VI

Hevle claims that the government engaged in outrageous conduct during the grand jury proceedings and that the district court erred in denying Hevle's motion to this effect. The scope of our review is quite narrow, because the petite jury convicted Hevle on all charges. Thus, "any error in the grand jury proceeding connected with the charging decision is deemed harmless beyond a reasonable doubt." *People of Territory of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993) (quoting *United States v. Mechanik*, 475 U.S. 66, 70 (1986)) (alterations and internal quotations omitted). After a conviction, only a structural error that renders the grand jury proceedings "fundamentally unfair" may be corrected. *Id.* at 399 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988)). The only structural errors the Supreme Court has recognized are racial and gender discrimination in the selection of the grand jurors. *See Bank of Nova Scotia*, 487 U.S. at 257.

Hevle does not posit any structural defects but instead argues that the government presented misleading evidence to

the grand jury about the "cause-in-fact" of the AB's war with the DC Blacks. Specifically, Hevle urges that the grand jury should have been apprised of the January 2 attacks at Marion, which he maintains had a more direct causal link to the race war than did his "get ready" message to the AB members at Marion, which arrived after January 2. However, the government has "no obligation to disclose 'substantial exculpatory evidence' to a grand jury." *United States v. Navarro*, 608 F.3d 529, 537 (9th Cir. 2010) (quoting *United States v. Haynes*, 216 F.3d 789, 798 (9th Cir. 2000)); *see also United States v. Williams*, 504 U.S. 36, 53 (1992) (prosecutor has no "binding obligation" to present substantial exculpatory evidence to the grand jury).

## VII

During the trial, Hevle sought to introduce the indictment in the related case of *United States v. Sahakian* from the Southern District of Illinois — in which he was not named as a defendant — in order to show that the government didn't believe he was a member of the conspiracy to murder DC Blacks at Marion.[8] The *Sahakian* indictment charged AB members at Marion with crimes related to assaults and murders following the January 2 attack by DC Blacks. The district court refused to admit the indictment under Fed. R. Evid. 403 because it was not particularly probative of Hevle's role in the conspiracy alleged in this case, created significant risk of jury confusion, and would waste time.

We review exclusion of the *Sahakian* indictment for abuse of discretion, *United States v. Pang*, 362 F.3d 1187, 1194 (9th Cir. 2004), and see none. It would not, as Hevle supposes, assist him in proving an "inconsistent theories" defense. The government may decide to charge or not to charge a suspect in an indictment for a variety of reasons that have nothing to do with his guilt or innocence, taking into consideration the

---

[8]On appeal as *United States v. Sahakian*, 453 F.3d 905 (7th Cir. 2006).

availability of prosecutorial resources, alternative priorities, the expectation of prosecution by other authorities, or any number of other valid discretionary reasons. *See, e.g.*, *United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir. 2002) ("[A] district court may properly exclude, under Fed. R. Evid. 403, a plea agreement offered for the purpose of establishing the government's belief in a person's innocence."); *see also United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990) ("Certainly, we cannot attribute the government's decision not to prosecute to an independent determination that the defendant is not guilty."); *United States v. Bakshinian*, 65 F. Supp. 2d 1104, 1105-10 (C.D. Cal. 1999). In addition, though the indictment itself may be concise, explaining its significance and relevance to the jury, combined with explaining the government's reasons for prosecuting Hevle with Bingham and not with Sahakian, would consume time with little or no probative value at the end of the day, and be unnecessarily confusing. In short, the district court acted well within its discretion in excluding the *Sahakian* indictment.

**AFFIRMED.**