FILED

JUL 23 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff - Appellee,<br><br>v.<br><br>MARIO GERARD BERNADEL,<br><br>Defendant - Appellant. | No. 10-10119<br><br>D.C. No. 2:08-cr-00256-SMM-1<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted June 13, 2012
San Francisco, California

Before: HUG, RAWLINSON, and IKUTA, Circuit Judges.

Mario G. Bernadel appeals his conviction by jury of one count of conspiracy

to commit mail fraud, wire fraud, and bank fraud in violation of 18 U.S.C.

§§ 1349, 1341, 1343, and 1344 (Count 1), six counts of mail fraud in violation of

18 U.S.C. § 1341 (Counts 2–7), seven counts of wire fraud in violation of 18

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

U.S.C. § 1343 (Counts 8–14), one count of bank fraud in violation of 18 U.S.C. § 1344 (Count 15), and four counts of money laundering in violation of 18 U.S.C. § 1957(a) (Counts 18, 19, 20, and 43). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

(1) The government presented sufficient evidence for a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find Bernadel guilty beyond a reasonable doubt of conspiracy to commit mail fraud, wire fraud, and bank fraud (Count 1). *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). The evidence introduced at trial supported the conclusion that Bernadel worked together with Amanda Adorno, April Lucero, and other co-defendants to recruit straw buyers with good credit scores and falsify the information on the buyers' loan applications for the agreed-upon purpose of deceiving financial institutions in order to get home loans approved, that they used the United States mails and wires to carry out this scheme to defraud, and that one or more overt acts listed in the indictment was taken in furtherance of the illegal purpose. *See United States v. Alonso*, 48 F.3d 1536, 1543 (9th Cir. 1995); *see also United States v. Rizk*, 660 F.3d 1125, 1134–35 (9th Cir. 2011); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010).

There was also sufficient evidence to convict Bernadel on a *Pinkerton* theory

of liability for the substantive counts of mail fraud (Counts 2–7), wire fraud

(Counts 8–14), and bank fraud (Count 15). *See Pinkerton v. United States*, 328

U.S. 640, 646–48 (1946). Although the government did not present evidence

directly tying Bernadel to the specific transactions that served as the basis for

Counts 2–12 and 14–15,[1] there was adequate evidence to support the conclusion

that these transactions were reasonably foreseeable acts committed by co-

defendants Adorno and Lucero in furtherance of the same overall conspiracy, *see*

*United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011), and that Bernadel

"knew, or had reason to know, that his benefits were probably dependent upon the

success of the entire operation," *United States v. Fernandez*, 388 F.3d 1199, 1226

(9th Cir. 2004) (quoting *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir.

1999)). Regardless whether, as Bernadel asserts, he and his co-conspirators were

in some sense competing real estate investors, the evidence established that there

was "an interdependent relationship between [their] fraudulent activities." *United*

*States v. Olano*, 62 F.3d 1180, 1194 (9th Cir. 1995). Bernadel helped facilitate the

transactions alleged in Counts 2–12 and 14–15 by, for example, (1) teaching

[1]The jury could rationally conclude from the evidence that Bernadel was directly involved in the transaction that served as the basis for Count 13, a wire transfer of loan proceeds used to purchase Bernadel's own personal property.

3

Adorno and Lucero how to carry out their own "cash-back" deals by recruiting straw buyers with good credit scores, setting up a limited liability company (LLC), getting the target property appraised at an amount higher than the seller's asking price, and using co-defendant and escrow agent Chris Bartlemus for the closing, (2) appearing at the closing of Adorno's first cash-back deal and assuring the straw buyers Adorno had recruited that the transaction was "completely legal," (3) providing Adorno and Lucero with a joint venture agreement to use with straw buyers, (4) meeting with Adorno and Lucero to discuss potential sellers, and (5) serving as the seller in one of Adorno's cash-back deals. Further, Bernadel benefitted substantially, albeit indirectly, from Adorno's and Lucero's deals: he sold at least four of his own properties to straw buyers that Adorno and Lucero recruited, and he borrowed $90,000 from Adorno that he had reason to know she had received from the illegal scheme.

The government also presented sufficient evidence for the jury to conclude beyond a reasonable doubt that Bernadel was responsible, as either a principal or an aider and abettor, for the transactions that served as the basis for money laundering Counts 18, 19, 20, and 43. The jury could rationally conclude that Bernadel was directly responsible for the cash-back transfers alleged in Counts 19 and 20 from Security Title to, respectively, JC Development (co-defendant John

4

Webber's company) and Compass Development (Bernadel's company), as these transfers involved proceeds from a fraudulently obtained loan used by straw buyer Christine Shiplett to purchase Bernadel's own personal property. There was also sufficient evidence to support the conclusion that Bernadel aided and abetted the cash-back transfer from Security Title to Lamp Light Marketing alleged in Count 43. Based on Joyce Johnson's testimony that Bernadel was present at the closing for the property involved and reassured the straw buyers that the transaction was completely legal, the jury could infer that Bernadel participated in the transaction as something he wished to bring about and sought by his assurance to make it succeed. *See United States v. Hungerford*, 465 F.3d 1113, 1117 (9th Cir. 2006); 18 U.S.C. § 2.[2] Finally, the jury could rationally conclude that Bernadel aided and abetted the cash-back transfer alleged in Count 18 from Security Title to AMB Consulting (co-defendant Marcus Branch's company) based on evidence that Bernadel was the instigator of the overall scheme and generally assisted Adorno, Lucero, and the others in its implementation. This was enough for the jury to infer

[2]Bernadel's assertion that his conviction on Count 43 must be overturned because the government did not charge the underlying criminal activity from which the cash-back funds were derived is unfounded. A money laundering conviction will stand so long as the evidence is sufficient to allow the jury to conclude that the funds were the receipts of prior criminal activity, whether charged or uncharged. *See United States v. Jenkins*, 633 F.3d 788, 805–06 (9th Cir. 2011).

that he sought by his actions to make this transaction succeed. *See Hungerford*, 465 F.3d at 1117; *see also United States v. Smith*, 832 F.2d 1167, 1170–71 (9th Cir. 1987).

Because there was sufficient evidence to support Bernadel's conviction on all counts, the district court did not err in denying Bernadel's motion for acquittal, nor did it abuse its discretion in denying Bernadel's motion for a new trial. *See Nevils*, 598 F.3d at 1170; *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992).

(2) The district court did not commit plain error in failing to instruct the jury that in order to convict Bernadel of the money laundering counts, it was required to find that the transactions at issue involved profits, and not merely gross receipts, of criminal activity. *See generally United States v. Santos*, 553 U.S. 507 (2008). It is not "clear" or "obvious" under current law, *see United States v. Olano*, 507 U.S. 725, 734 (1993), that the cash-back transfers that served as the basis for the money laundering counts merged with the substantive counts of mail fraud, wire fraud, and bank fraud, such that a *Santos* jury instruction was required, *see United States v. Van Alstyne*, 584 F.3d 803, 814–16 (9th Cir. 2009). The criminal conduct charged in the substantive fraud counts (the mailings of the fraudulent loan applications to the mortgage lenders, as well as the wire transfers from the

6

mortgage lenders to Security Title) was different from the criminal conduct charged in the money laundering counts (the cash-back transfers from Security Title to the defendants after the loans had been fraudulently procured), indicating that the money laundering transactions were not "a crucial element of the 'scheme to defraud.'" *Id.* at 815; *see also United States v. Wilkes*, 662 F.3d 524, 549 (9th Cir. 2011); *United States v. Ali*, 620 F.3d 1062, 1072 (9th Cir. 2010). Furthermore, it would not be plain error to conclude that there is no merger problem where, as here, the money laundering counts are based on transfers of ill-gotten gains from one co-conspirator to another. *See Wilkes*, 662 F.3d at 549. Finally, unlike in *Santos*, the money laundering counts did not lead to "'a radical increase in the statutory maximum sentence' for the underlying offense," *United States v. Bush*, 626 F.3d 527, 538 (9th Cir. 2010) (quoting *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009)); in fact, they did not increase Bernadel's sentence at all because the district court ordered all prison terms to run concurrently. Accordingly, the district court did not plainly err in not giving a *Santos* jury instruction.

(3) The district court did not abuse its discretion in relying on the purported Maricopa County property records for its loss calculation under U.S.S.G. § 2B1.1(b) because the information contained therein was corroborated by the

7

escrow files introduced at trial, and the records therefore bore "sufficient indicia of reliability to support [their] probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993).

(4) The district court did not commit plain error by using a preponderance-of-the-evidence standard of proof, as opposed to a clear-and-convincing-evidence standard of proof, in calculating loss under U.S.S.G. § 2B1.1(b) because the loss calculation was based on evidence presented at trial to support the conspiracy charge, and Bernadel cannot contend that he was "denied adequate procedural protection in contesting that evidence." *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

(5) The district court did not err by increasing Bernadel's offense level by eighteen levels under U.S.S.G. § 2B1.1(b)(1)(J) based on a finding that the loss attributable to Bernadel was more than $2.5 million but less than $7 million. Although the district court erred by calculating loss based on the *purchase price* less the amount the lender or successor lender recovered through sale of the property after foreclosure, rather than the *loan amount* less the amount the lender or successor lender recovered through sale of the property after foreclosure, *see United States v. Yeung*, 672 F.3d 594, 604 (9th Cir. 2012), and by including loss purportedly related to properties that were never the subject of foreclosure

8

proceedings, these errors were harmless. Even using the proper methodology, the loss attributable to Bernadel was over $2.5 million. The district court was not required to credit against loss the mortgage payments made on the loans because Bernadel did not point to any specific payments that were made, and the evidence at trial indicated that any payments were negligible and did not decrease the principal balance due on the loans. *See United States v. Davoudi*, 172 F.3d 1130, 1136 (9th Cir. 1999); *United States v. Allen*, 88 F.3d 765, 771 (9th Cir. 1996). Nor did the district court err by including the loss incurred by successor lenders, because such loss was a reasonably foreseeable pecuniary harm resulting from Bernadel's offense. *See* U.S.S.G. § 2B1.1 app. n.3(A)(i). Finally, the district court was not required to discount the loss to account for external market factors beyond Bernadel's control because the Guidelines explicitly provide that in cases involving pledged collateral, the loss should be reduced by "the amount the victim has recovered *at the time of sentencing* from disposition of the collateral," not by the value the collateral could have had in better economic conditions. U.S.S.G. § 2B1.1 app. n.3(E)(ii) (emphasis added).

(6) The district court did not err in increasing Bernadel's offense level by two levels under U.S.S.G. § 2B1.1(b)(14)(A) (2009) based on a finding that Bernadel derived more than $1 million in gross receipts from one or more financial

9

institutions. The loan that was fraudulently obtained for straw buyer Shiplett to purchase Bernadel's property at 7301 East Third Avenue #309 alone totaled $932,760.52; this money flowed to Bernadel as the seller and qualifies as "gross receipts" regardless whether Bernadel used some of it to pay the straw buyer or to pay off his mortgage. *See United States v. Kohli*, 110 F.3d 1475, 1477–78 (9th Cir. 1997). The district court also properly included as "gross receipts" the fraudulently obtained loan proceeds that passed through Security Title to Bernadel's company as cash-back. *See Kohli*, 110 F.3d at 1477–78. Based on Bartlemus's notes (introduced into evidence as trial exhibit 334) showing that he disbursed over $100,000 in loan proceeds for properties involved in the conspiracy to Bernadel's company as cash-back, together with the Shiplett loan, the district court could conclude by a preponderance of the evidence that Bernadel derived over $1 million in gross receipts from one or more financial institutions "directly or indirectly as a result of [his] offense[s]." U.S.S.G. § 2B1.1 app. n.11(B).

(7) The district court did not err in increasing Bernadel's offense level by two levels under U.S.S.G. § 2B1.1(b)(2)(A) based on a finding that there were ten or more victims. Even when considering only the counts of conviction, Bernadel was responsible for defrauding the ten mortgage lenders identified in Counts 2–15 of the indictment, whose losses were also included in the district court's loss

10

calculation. *See United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008). Contrary to Bernadel's assertion, the Guidelines do not require that victims come forward to claim restitution in order to be counted under U.S.S.G. § 2B1.1(b)(2), as the Guidelines enhancements serve different purposes than the restitution statute. *See United States v. Gossi*, 608 F.3d 574, 579–80 (9th Cir. 2010).

(8) The district court did not err in applying a two-level sentence enhancement under U.S.S.G. § 3C1.1 based on obstruction of justice. The district court reasonably concluded that Bernadel's multiple pro se pleadings, which demanded that various individuals associated with the case, including government witnesses Thomas Giallanza and William Park, comply with his requests or be subject to default judgments or prosecution for mail and wire fraud, constituted an attempt to "threaten[], intimidat[e], or otherwise unlawfully influenc[e] . . . [a] witness." U.S.S.G. § 3C1.1 app. n.4(A). Although Bernadel's pro se pleadings were filed after all the trial testimony had concluded, they could have been intended to influence potential witnesses at sentencing. *Cf. United States v. Kilbride*, 584 F.3d 1240, 1262 (9th Cir. 2009). The district court's assessment of Bernadel's intent in filing these pleadings was a finding of fact, which we review for clear error. *See United States v. Shetty*, 130 F.3d 1324, 1333 (9th Cir. 1997). Given that Bernadel continued to file several pleadings threatening suit even after

11

the district court warned him that they had the potential "to harass and disrupt lives of public employees," the district court could logically infer that Bernadel's intent was to threaten and intimidate potential witnesses, rather than to set forth a legitimate claim. *See United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

(9) The district court did not abuse its discretion in declining to grant a downward departure under U.S.S.G. § 2B1.1 app. n.19(C), on the ground that the Guidelines range substantially overstated the seriousness of Bernadel's offense. Post-*Booker*, we do not review the district court's application of a particular departure provision for procedural error; rather, we review the district court's deviation from the applicable Guidelines range once for substantive reasonableness. *See United States v. Ellis*, 641 F.3d 411, 421–22 (9th Cir. 2011); *United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006).

(10) Because the district court did not err in calculating Bernadel's offense level as 35, the district court did not err in imposing a $25,000 fine, which was at the low end of the Guidelines range of $20,000 to $200,000. *See* U.S.S.G. § 5E1.2(c)(3).

(11) Bernadel's sentence was not substantively unreasonable. His sentence of 200 months was at the low end of the Guidelines range of 188 to 235 months for

12

an offense level of 35, *see* U.S.S.G. § 5.A, and well within the statutory maximum of thirty years for mail fraud, wire fraud, bank fraud, and conspiracy to commit the same, *see* 18 U.S.C. §§ 1341, 1343, 1344, 1349. The district court carefully reviewed all the sentencing materials, considered the factors set forth in 18 U.S.C. § 3553(a), and explained that a sentence of 200 months was appropriate because it was in line with sentences imposed by other courts in similar mortgage fraud cases, and because Bernadel engaged in serious deception and manipulation, leaving many broken lives in his wake. This was not an abuse of discretion. *See United States v. Carty*, 520 F.3d 984, 993–95 (9th Cir. 2008) (en banc).

**AFFIRMED.**

*United States v. Bernadel*, No. 10-10119
IKUTA, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority's conclusions as to all other claims, I would reverse Bernadel's conviction on Count 18. A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could not conclude beyond a reasonable doubt that Bernadel aided and abetted the "cash-back" transfer from Security Title to AMB Consulting that served as the basis for this money laundering count. *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). Unlike *Pinkerton* liability, which focuses on the defendant's role in the overall conspiracy, aiding and abetting liability depends on the defendant's connection to the specific criminal act the defendant is alleged to have aided or abetted. *See United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011).[1] There was, quite simply, no evidence that Bernadel associated himself with the specific transaction alleged in Count 18, participated in it as something he wished to bring about, or sought by his actions to make it succeed. *See United States v. Hungerford*, 465 F.3d 1113, 1117 (9th Cir. 2006).

---

[1]Contrary to the government's suggestion at oral argument, the district court did not give a *Pinkerton* instruction with respect to the money laundering counts, so we cannot uphold Bernadel's money laundering convictions on a *Pinkerton* theory. *See United States v. Straub*, 538 F.3d 1147, 1165 (9th Cir. 2008).