**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Aundre Sterling WRIGHT, Defendant–Appellant.**

**No. 98–50489.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 14, 1999

Filed June 19, 2000

Joseph F. Walsh, Los Angeles, California, for the defendant-appellant.

Nancy Kardon, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: THOMAS, SILVERMAN, and WARDLAW, Circuit Judges.

SILVERMAN, Circuit Judge:

Defendant Aundre Sterling Wright appeals his jury convictions and 214–month sentence for conspiracy to commit armed bank robbery (18 U.S.C. § 371), armed bank robbery (18 U.S.C. § 2113(a) & (d)), and using or carrying a firearm during a crime of violence (18 U.S.C. § 924(c)). We hold that (1) the district court did not err in declining to suppress the results of a court-ordered blood sample taken from Wright after his arrest, (2) the district court did not abuse its discretion in admitting DNA evidence, (3) there was sufficient evidence to support Wright's convictions, and (4) application of the Sentencing Guideline enhancement for discharge of a firearm during a robbery was proper. Wright's conviction and sentence are affirmed.

## I. Facts

According to evidence presented by the government at trial, on October 15, 1996, at approximately 9:10 a.m., at least three individuals pulled up to the front of the Wells Fargo Bank in West Covina, California in a stolen van. Each of the individuals wore dark clothing and ski masks, and at least two of them carried firearms. Either while or immediately after they exited the van, one of the robber's weapons discharged, striking one of them in the foot. Undeterred by the gunshot wound to one of their number, they entered the bank.

Brandishing firearms, the robbers, including the injured one, ordered the bank employees and customers to the ground. The wounded robber, still bleeding from his injury, went behind the teller counter and pushed one of the female tellers to the floor, leaving blood on her clothing.

Several minutes later, the robbers exited the bank, taking with them a locked money cart used by bank employees to transport currency from the vault to the individual tellers' cash drawers. A witness saw the injured robber exiting the bank with a Mac–10 or Uzi type assault weapon. Once outside, the robbers attempted to break open the money cart, but were largely unsuccessful. Although the cart contained over $16,000, they only managed to remove approximately twelve dollars.

The injured robber and his cohorts limped and ran, respectively, towards a nearby freeway, where a piece of fence previously had been bent down to allow access to the roadway. They entered a waiting getaway van—also stolen—and made their escape on the freeway. At the next freeway exit, the robbers exited and drove to a Mobil gas station, where yet another stolen van was waiting. Some of the robbers moved from the first getaway van to the second, and drove off. However, one robber walked across the street, got into a car rented to a John Noble, and drove off.

When police examined the getaway van left at the Mobil station, they found an expended nine-millimeter bullet with a pool of blood around it. When FBI agents arrived at the bank shortly after the robbery, they discovered an ejected nine-millimeter shell casing on the pavement outside the bank next to the robbers' abandoned van. FBI agents also discovered several blood stains on the floor of

the bank, which a Los Angeles County Sheriff's Department criminalist later determined to be the blood trail of an individual who had been wounded in the foot or lower leg.[1]

The day after the robbery, the FBI received an anonymous tip identifying Aundre Wright as the robber who had been wounded outside the bank. Additional investigation revealed that according to California Department of Motor Vehicles records, John Noble—in whose name the getaway car seen at the Mobil station had been rented—lived one house away from Wright. Investigators also discovered that shortly after the robbery, Wright disappeared from his old neighborhood and began staying at a friend's house. When investigators finally located Wright, they noticed that his foot was bandaged and that he was walking with the aid of crutches. Police then arrested Wright for the robbery of the West Covina Wells Fargo Bank.

After arresting Wright, officers of the West Covina Police Department took him to the Queen of the Valley Hospital in accordance with a departmental policy requiring that injured persons be examined by a doctor before being booked into jail. The examination revealed that Wright had sustained a gunshot wound to his foot. X-rays showed the presence of bullet fragments. On his own initiative, the doctor ordered and obtained a specimen of Wright's blood for diagnostic purposes.

The next day, investigators discovered that Wright had not been at work the morning of the robbery, and had told his boss that he had tripped on a child's toy and injured his ankle. They also learned that Wright had told another person that he had injured his foot playing football.

---

1. The criminalist noted that the bloodstains on the floor in the bank were in the shape of shoe prints, and continued for over 162 feet at regular intervals. Because the amount of blood in the shoe prints did not dissipate over a distance, the criminalist theorized that the wounded robber had suffered a wound to the lower leg or foot, and that the bleeding from the wound had provided a continually replenishing blood supply which was left behind in the bloodstains.

Investigators obtained a court order to draw a sample of Wright's blood for comparison with the blood left by the injured robber at the bank. According to the government's DNA expert, Wright's DNA profile matched that of the blood found in the bank. The expert testified that the probability that the DNA of a Black individual selected at random would match the DNA recovered from the crime scene was approximately one in 1.3 billion.

Wright was convicted by a jury of conspiracy to commit armed bank robbery, armed bank robbery, and using or carrying a firearm during a crime of violence. He was sentenced to 214 months imprisonment, followed by 5 years of supervised release.

## II. Standards of Review

▮ Motions to suppress are generally reviewed de novo. *See United States v. Kemmish*, 120 F.3d 937, 939 (9th Cir.1997). The issuance of a search warrant by a magistrate judge is reviewed for clear error. *See United States v. Fulbright*, 105 F.3d 443, 453 (9th Cir.1997). We review to determine whether the magistrate had a substantial basis for concluding that the affidavit in support of the warrant established probable cause. *See Fulbright*, 105 F.3d at 453; *United States v. Brown*, 951 F.2d 999, 1002 (9th Cir.1991).

▮ A district court's ruling on the admissibility of DNA evidence is reviewed for an abuse of discretion. *See United States v. Hicks*, 103 F.3d 837, 844 (9th Cir.1996); *United States v. Chischilly*, 30 F.3d 1144, 1152 (9th Cir.1994).

▮ There is sufficient evidence to support a conviction if, in viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

▮ This court reviews the district court's interpretation and application of the Sentencing Guidelines de novo. *See United States v. Smith*, 175 F.3d 1147, 1148 (9th Cir.1999); *United States v. Shaw*, 91 F.3d 86, 88 (9th Cir.1996). The district court's factual findings at sentencing are reviewed for clear error. *See Shaw*, 91 F.3d at 88.

## III. Analysis

### A. The Court–Ordered Blood Sample

#### 1. Probable Cause to Seize a Sample of Wright's Blood

▮ Wright first contends that there was insufficient probable cause for the magistrate judge to have ordered him to provide a blood sample. Intrusions into the human body, including the taking of blood, are searches subject to the restrictions of the Fourth Amendment. *See Barlow v. Ground*, 943 F.2d 1132, 1137 (9th Cir.1991) (citing *Schmerber v. California*, 384 U.S. 757, 766–68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)). In order to pass Fourth Amendment muster, a warrant must be supported by probable cause. *See* U.S. Const. amend. IV.

▮ Wright correctly points out that "an anonymous tip, without more, does not constitute probable cause." *United States v. Mendonsa*, 989 F.2d 366, 368 (9th Cir. 1993) (citing *Illinois v. Gates*, 462 U.S. 213, 227, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). However, *Gates* teaches that the relevant inquiry looks to the totality of the circumstances, that is, whether "given all the circumstances set forth in the affidavit before [the magistrate] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. In this case, the application for the court order contained an abundance of *additional* evidence which, when considered along with the anonymous tip, was sufficient to support a finding of probable cause to believe that Wright's blood would have evidentiary value:

- An armed robbery was committed at the West Covina branch of the Wells Fargo Bank on October 15, 1996.

- The FBI recovered an expended 9 millimeter shell casing next to the front passenger door of a van parked directly in front of the bank. A blood trail led from the van into the bank and behind the teller counter.

- More blood and a blood-stained bullet were found inside one of the vans the robbers used to make their getaway from the bank.

- The day after the robbery, a citizen informant told the FBI that Wright was one of the Wells Fargo robbers. The informant also stated that Wright had been shot in the leg before entering the bank.

- Wright had not been at work *on* the day of the robbery.

- Wright's leg was uninjured on October 14, 1996, the day *before* the robbery.

- By October 22, 1996, the date he was arrested, Wright was recovering from a recent gunshot wound to his foot.

- Wright gave conflicting stories to different people about how his foot was injured, but none of those stories acknowledged that the injury was due to a gunshot.

- DMV records indicated that Wright lived one house away from John Noble, who already had been arrested and charged with being one of the Wells Fargo bank robbers.

- Shortly after the robbery, Wright began staying somewhere else.

- Taken as a whole, the facts presented to the magistrate judge corroborated the tip and established, as required by *Gates*, a "fair probability" that Wright's blood specimen would yield evidence of the robber's identity.

### 2. Fruit of the Poisonous Tree

Wright also contends that the result of the court-ordered blood draw is "fruit of the poisonous tree" and must be suppressed.

#### a. Arrest Without Probable Cause

First, Wright argues that there was no probable cause to arrest him and that therefore, he should not have been taken to the hospital for the pre-booking examination. It was by that examination that the police discovered that Wright had a gunshot wound to the foot, a fact that was used to obtain the court order for the blood draw.

We decline to reach the merits of Wright's argument because he failed to raise the issue of his allegedly illegal arrest in a pre-trial suppression motion to the district court. Although Wright did file a motion to suppress various items of evidence, including the blood samples and the results of the DNA tests, he never argued that those items of evidence were the fruits of an illegal arrest. Federal Rule of Criminal Procedure 12(b)(3) requires that motions to suppress evidence be raised prior to trial; under Rule 12(f) failure to bring a timely suppression motion constitutes a waiver of the issue. It does not matter that Wright made a pre-trial motion to suppress on other grounds, for "just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress." *United States v. Restrepo–Rua,* 815 F.2d 1327, 1329 (9th Cir.1987). By failing to comply with Rule 12, Wright waived any dispute about the legality of his arrest and placed the issue beyond this court's ability to review for plain error. *See United States v. Weathers,* 186 F.3d 948, 955–57 (D.C.Cir.1999); *United States v. Chavez–Valencia,* 116 F.3d 127, 129–33 (5th Cir.1997).

Recent Supreme Court and 9th Circuit cases on plain error review are inapplicable in this case because those cases all involved the failure to object to various alleged trial errors. *See United*

*States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Perez,* 116 F.3d 840 (9th Cir.1997) (en banc); *United States v. Sayetsitty,* 107 F.3d 1405 (9th Cir.1997). Trial errors are outside the purview of Rule 12, which governs pretrial proceedings and specifically requires that defendants assert certain types of claims before trial, or waive them.

However, even issues that are deemed waived under Rule 12 may be addressed by this court and relief may be granted "for cause shown." Wright has advanced no cause for failing to first raise his illegal arrest claim to the district court in a pretrial suppression motion. We therefore decline to review the merits of Wright's illegal arrest and resulting fruits of the poisonous tree claim.

### b. Previous Blood Sample

 Secondly, Wright contends that the court-ordered blood sample of October 23, 1996 was the fruit of an illegally obtained sample taken on October 22 when Wright was examined at the hospital prior to being booked into jail. However, Wright never established that the government ever used the first blood sample against him in any way. *See United States v. Allard,* 600 F.2d 1301, 1305 (9th Cir.1979) (holding that " 'the defendant must ... establish a factual nexus between the illegality and the challenged evidence' ") (quoting *United States v. Choate,* 576 F.2d 165, 186 (9th Cir.1978)). It is undisputed that all of the DNA testing was conducted on the court-ordered sample taken the next day. The application for the court order made no mention of any information gathered from the first draw. This is entirely consistent with the district court's finding that the first blood specimen was collected for medical, not forensic purposes. Because there is no indication that the government learned anything

from or otherwise used the first blood draw, the fruit of the poisonous tree doctrine is inapplicable, and the district court's refusal to suppress was not erroneous. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### c. Bedroom Search

 Finally, Wright contends that the police conducted an unlawful warrantless search of his bedroom,[2] and that the court-ordered blood sample somehow was a fruit of this illegal search. However, the application for the court order made no mention of any information gained in or resulting from the bedroom search. The blood draw order was completely independent of the search.

### B. Admission of DNA Evidence

This court has already recognized the admissibility of both types of DNA tests used in this case, the PCR and RFLP tests, holding that both satisfied the Supreme Court's *Daubert* standard for the admissibility of scientific evidence. *See United States v. Hicks,* 103 F.3d 837, 846–47 (9th Cir.1996); *United States v. Chischilly,* 30 F.3d 1144, 1153–56 (9th Cir. 1994). Wright invites us to revisit the issue in light of the California Supreme Court decision in *People v. Venegas,* 18 Cal.4th 47, 74 Cal.Rptr.2d 262, 954 P.2d 525 (1998), an invitation we decline. The DNA evidence in *Venegas* was rejected because personnel in the particular laboratory in that case failed to follow correct scientific procedures, not because of any unreliability in DNA testing in general. *See id.* at 93, 74 Cal.Rptr.2d 262, 954 P.2d 525. Wright does not contend that the correct testing procedures were disregarded in this particular case.

---

**2.** Wright was staying at another person's house at the time of his arrest, and officers obtained consent to search from the owner of the property, but not from Wright. Contrary to Wright's claim, the district court never

ruled on the legality of the bedroom search. However, even if the court had ruled the search illegal, the court-ordered blood sample was not a fruit of the search.

Wright also argues that the results of the DNA expert's testimony about the probability of a random match (1 in 1.3 billion in the Black population) was the sort of statistical evidence rejected in *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968). *Collins* is not a DNA case. It concerned prosecution testimony about the probabilities of an inaccurate eyewitness identification and is simply inapplicable here.

### C. Sufficiency of the Evidence

Wright claims the evidence was insufficient to support his convictions. There was, however, abundant evidence to support the convictions for conspiracy, armed bank robbery, and using or carrying a firearm during a crime of violence.

#### 1. Conspiracy and Armed Bank Robbery

To establish conspiracy, the government must show: (1) an agreement (2) to engage in criminal activity and (3) one or more overt acts in furtherance of the conspiracy. *See* 18 U.S.C. § 371. Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction. *See United States v. Ladum*, 141 F.3d 1328, 1341 (9th Cir.), *cert. denied*, 525 U.S. 898, 119 S.Ct. 225, 142 L.Ed.2d 185 (1998) *and* 525 U.S. 1021, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998). However, the government need not prove knowledge with direct evidence; circumstantial evidence and the inferences drawn from that evidence can sustain a conspiracy conviction. *See id.* Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt even a slight connection of a defendant with the conspiracy is sufficient to convict the defendant of knowing participation. *See id.* at 1381.

To prove armed bank robbery, the government must show: (1) the defendant took money belonging to a bank, credit union, or savings and loan, (2) by using force and violence or intimidation, (3) the deposits of the institution were insured by the Federal Deposit Insurance Corporation ("FDIC"), and (4) in committing the offense, the defendant assaulted any person, or put in danger the life of any person by the use of a dangerous weapon. *See* 18 U.S.C. § 2113(a) & (d).

Viewing the evidence in the light most favorable to sustaining the jury's guilty verdict, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we conclude there was indeed sufficient evidence from which a reasonable jury could find Wright guilty beyond a reasonable doubt of conspiracy to commit armed bank robbery and armed bank robbery. The DNA evidence alone overwhelmingly establishes that Wright was one of the individuals who robbed the Wells Fargo Bank.

#### 2. Using or Carrying a Firearm During a Crime of Violence

The crime of using or carrying a firearm during a crime of violence requires proof of an underlying predicate offense—that is, a crime of violence—during which a firearm was used or carried. *See United States v. Castaneda*, 9 F.3d 761, 765 (9th Cir.1993). 18 U.S.C. § 924(c)(3) defines a crime of violence for purposes of § 924(c) as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." Armed bank robbery qualifies as a crime of violence because one of the elements of the offense is a taking "by force and violence, or by intimidation." 18 U.S.C. § 2113(a).

The only remaining issue is whether the evidence at trial established that Wright used or carried a firearm during the robbery. A bystander outside the bank testified that he saw a robber exit the bank, limping and carrying an Uzi or Mac–10 type machine gun. The L.A. County Sheriff's Department criminalist testified that the pattern of bloodstains left

on the bank floor indicated that one of the robbers was wounded, and DNA testing evidence proved that the bloodstains in the bank came from Wright. From this evidence, a jury could have found beyond a reasonable doubt that Wright was the limping, bleeding robber seen carrying the gun as he fled the bank.

### D. Sentencing Enhancement for Discharge of a Firearm

Wright advances several arguments that the district court erred in applying the seven-level § 2B3.1(b)(2)(A) enhancement for discharging a firearm during a bank robbery, all of which lack merit.

### 1. 18 U.S.C. § 924(c) Conviction and Seven–Level Enhancement Under USSG § 2B3.1(b)(2)(A)

Wright first points to note 2 of USSG § 2K2.4, the Guidelines provision that determines sentencing for 18 U.S.C. § 924(c) convictions, and claims that the plain language clearly states that the seven-level enhancement of § 2B3.1(b)(2)(A) should not have been applied. Note 2 states:

> Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (e.g., § 2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the underlying offense.

The problem with this argument, however, is that application note 2 goes on to state an important exception to the general rule:

> In a few cases, the offense level for the underlying offense determined under the preceding paragraph may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. § 844(h), § 924(c), or § 929(a), produces a total maximum penalty that is less than the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C.

§ 844(h), § 924(c), or § 929(a) (i.e., the guideline range that would have resulted if the enhancements for possession, use, or discharge of a firearm had been applied). In such a case, an upward departure may be warranted so that the conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a) does not result in a decrease in the total punishment. An upward departure under this paragraph shall not exceed the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a).

The district court found that Wright's circumstances presented exactly the situation contemplated by the second part of application note 2. We agree. Without the § 924(c) conviction, Wright's base offense level would have been a 32 (including the seven-level enhancement under § 2B3.1(b)(2)), with a criminal history category of V. Under the Guidelines, this would have produced a sentencing range of imprisonment for 188–235 months. However, *with* the additional § 924(c) conviction, but without the § 2B3.1(b)(2) enhancement, Wright would have had a base offense level of 25, criminal history category V, which would have produced a sentencing range of 100–125 months. When the mandatory consecutive 60 month sentence for § 924(c) was added to this range, Wright's final sentencing range would have been only 160–185 months, *less* than the range he would have been subject to without the additional § 924(c) conviction. Application note 2 was intended precisely to close this anomalous loophole in the sentencing structure, and the district court properly applied it in this particular case.

### 2. Discharge of a Firearm During and in Furtherance of the Bank Robbery

Defendant next argues that discharging a firearm prior to entering the bank was not a discharge *during* the robbery, but was rather *before* the robbery began. Wright also argues that discharg-

ing the firearm into his foot was not an act in furtherance of the robbery, but rather hindered the successful completion of the robbery.

The district court found that the robbery had already begun when the weapon was discharged. The robbers were exiting a stolen van in front of the bank. They were dressed in dark clothing and were wearing masks to hide their faces. One robber pointed a gun at a bystander, causing the bystander to flee for cover and preventing customers from entering the bank. While it is true that the robbers had yet to enter the bank, they were seconds from doing so. At least one robber was brandishing a weapon at bystanders in order to keep them from entering the bank. The district court did not clearly err in concluding that the robbery had already commenced when the gun was discharged, especially since there is no ceremonial moment analogous to the lighting of the Olympic flame that marks the official start of a bank robbery.

 Wright also argues that the discharge was not "in furtherance" of the robbery, and therefore is not cause for enhancement under § 2B3.1(b)(2)(A). However, by its terms, § 2B3.1(b)(2)(A) applies "if a firearm was discharged," whether or not the fired shot helped the criminal endeavor.

### 3. Intent to Discharge the Firearm

 Finally, Wright argues that the discharge of the gun should not have been considered for guidelines purposes because it was accidental, not "willfully caused." This argument derives from his interpretation of § 1B1.3 of the Guidelines which provides that in determining specific offense characteristics, the court may consider "all acts and omissions committed,

aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."

Wright also relies on *United States v. Gordon*, 64 F.3d 281 (7th Cir.1995). In *Gordon*, the district court applied a seven-level enhancement to a bank robbery sentence because a gun was discharged during the course of a bank robbery even though the gun was fired, not by the defendant, but by a security guard who shot the defendant. The Seventh Circuit reversed, holding that when a *third party* fires a gun in the course of a crime, it must be shown that the defendant "willfully caused" him to do so before the conduct may be considered against the defendant.

The situation before us is quite different. The defendant did not cause someone else to fire the gun; he fired it himself. By the plain language of § 1B1.3, specific offense characteristics are determined by "all acts and omissions committed ... *or* willfully caused by the defendant." "Willfully" modifies "caused," not "committed." The guideline thus holds a defendant responsible for his *own* acts, and for the acts of others that he willfully causes *them* to commit. Since Wright himself fired the gun, albeit accidentally, the application of the enhancement was proper.

### IV. Conclusion[3]

For the forgoing reasons, Wright's convictions and sentence are

AFFIRMED.

---

**3.** Wright also raised a new argument for the first time in his reply brief: whether the increased departure under application note 2 of § 2K2.4 is automatically applied at the election of the government, or requires a finding that the aggravating circumstances bring the

case outside the "heartland" of cases under the Sentencing Guidelines. Because this argument was not raised previously, we decline to consider it. *See Boldt v. Crake (In re Riverside–Linden Inv. Co.)*, 945 F.2d 320, 324 (9th Cir.1991).