**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 19-50253 |
| | D.C. No. 2:16-cr-00390-RGK-12 |
| v. | |
| ALEXIS JAIMEZ, AKA Alexis Dominic Jaimez, AKA Alexis Dominica Jaimez, AKA Lex, AKA Lil Travieso, *Defendant-Appellant.* | OPINION |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted May 17, 2022
Pasadena, California

Filed August 23, 2022

Before: John B. Owens and Daniel A. Bress, Circuit
Judges, and Sidney A. Fitzwater,[*] District Judge.

Opinion by Judge Bress;
Partial Concurrence and Partial Dissent by Judge Owens

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge
for the Northern District of Texas, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

Affirming Alexis Jaimez's convictions for conspiracy to distribute a controlled substance, money laundering conspiracy, and RICO conspiracy, the panel held that sufficient evidence supported the convictions and that Jaimez's challenges to the jury instructions lacked merit.

The evidence at trial showed that Jaimez was a "foot soldier" for the Canta Ranas Organization, or CRO, a violent street gang. The panel held that sufficient evidence supported Jaimez's conviction for conspiracy to distribute a controlled substance (methamphetamine), in violation of 21 U.S.C. § 846. Specifically, there was sufficient evidence that Jaimez joined the gang's drug distribution conspiracy knowing its scope and object and intending to help accomplish its purpose.

The panel held that sufficient evidence supported Jaimez's conviction for money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), which required the government to prove beyond a reasonable doubt that there was an agreement to commit money laundering, the defendant knew the objective of the agreement, and the defendant joined the agreement with the intent to further its unlawful purpose. Jaimez did not dispute that the CRO conspired to launder money by transferring extortionate "taxes" collected by foot soldiers to incarcerated gang leaders. Viewing the evidence in the light most favorable to

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the government, the panel concluded that there was sufficient evidence that Jaimez himself knew of and intended to support the CRO's money laundering, and that he was not convicted solely on the basis of his CRO membership.

The panel held that, as related to the money laundering conspiracy charge, the district court did not plainly err in instructing the jury, in the course of generally defining the term "knowingly," that the government was "not required to prove that the defendant knew that his acts or omissions were unlawful."

The panel held that sufficient evidence supported Jaimez's conviction for RICO conspiracy, in violation of 18 U.S.C. § 1962(d), which required the government to present adequate proof of an overall conspiracy to participate, directly or indirectly, in the conduct of the RICO enterprise's affairs through a pattern of racketeering. A pattern of racketeering activity requires proving at least two predicate acts of racketeering. The panel held that because there was sufficient evidence for the drug distribution and money laundering conspiracies, at least two RICO predicates were sufficiently established for purposes of the RICO conspiracy conviction. The panel further concluded that extortion served as another sufficient predicate act. The panel held that a conspiracy conviction can stand if one of the objects is only factually, but not legally, insufficient. Thus, even if there had been insufficient evidence for money laundering conspiracy, the RICO conviction would still stand because there was sufficient evidence for the other two valid predicate activities, drug distribution conspiracy and extortion.

The panel addressed additional issues in a concurrently filed memorandum disposition.

Concurring in part and dissenting in part, Judge Owens concurred in Parts I and II.A of the majority opinion, providing an overview of the evidence presented at trial and addressing the sufficiency of the evidence supporting the conviction for conspiracy to distribute a controlled substance, along with most of Part II.C, addressing the RICO conspiracy conviction. Judge Owens dissented from Part II.B, addressing the sufficiency of the evidence supporting the money laundering conviction, and the sections of Part II.C that implied that the evidence showed that Jaimez knew the objective of the money laundering conspiracy or joined with the intent to further that purpose. Judge Owens wrote that the government had to prove that Jaimez knew the purpose of the money laundering agreement was to conduct a financial transaction (sending money to incarcerated gang members) and that the transaction was intended to conceal the unlawful sources of the funds (extortion and drug distribution). But the evidence introduced at trial did not show that Jaimez, in his role as a low-ranking foot soldier, either knew that objective or joined the money laundering agreement with the intent to further its purpose.

## COUNSEL

Verna Wefald (argued), Pasadena, California; Devin Burstein, Warren & Burstein, San Diego, California; for Defendant-Appellant.

Chelsea Norell (argued) and Kathy Yu, Assistant United States Attorneys; Bram M. Alden, Chief, Criminal Appeals Section; Tracy L. Wilkison, Acting United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

BRESS, Circuit Judge:

Alexis Jaimez appeals his convictions for conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846; money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and conspiracy under the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO), in violation of 18 U.S.C. § 1962(d). We hold that sufficient evidence supported the convictions and that Jaimez's challenges to the jury instructions lack merit. We therefore affirm his convictions.[1]

I

We provide an overview of the evidence presented at trial and then elaborate on aspects of the government's case when addressing Jaimez's specific objections to his convictions.

The Canta Ranas Organization (CRO) is a violent street gang headquartered in Southern California that is involved in drug dealing and other crimes. The CRO, comprised of approximately 140 members, operates in association with the Mexican Mafia, another criminal organization, which functions both inside and outside California's prison system. A multi-agency investigation into the CRO resulted in an indictment charging 51 defendants, including Jaimez, with numerous crimes. The indictment included a RICO

---

[1] We address some of Jaimez's challenges in a concurrently filed memorandum disposition, which also affirms the convictions of his co-defendant, Monica Rodriguez.

conspiracy charge with drug distribution conspiracy, money laundering conspiracy, and extortion as predicate acts.

The evidence at trial established that Jaimez was a CRO "foot soldier," including in the Riverside, California area. He agreed to extort "taxes" from local drug dealers on behalf of the gang, and discussed smuggling drugs into prison using so-called "happy cards." The government's expert testified that a "happy card is a greeting card . . . saturated in a narcotic" that is used to transport drugs into prison. Happy cards are "extremely valuable" and can be sold for ten to twenty times more than the street value of the drug. Jaimez and two companions also violently assaulted an individual in a parking-lot altercation. During the assault, one of Jaimez's companions yelled out "Canta Ranas," and took off his shirt to reveal a gang tattoo. Jaimez himself had a tattoo denoting his CRO membership, and his brothers were members of the gang as well.

The jury received extensive evidence and heard expert testimony about the CRO's hierarchical structure and illegal financial operations. In particular, the jury heard that the CRO's primary activity and source of profits was dealing drugs, including methamphetamine, and that the gang also engaged in extortion and money laundering. Foot soldiers like Jaimez dealt drugs and collected extortionate taxes from street-level dealers who operated in the gang's geographic territory. They then turned over their tax proceeds to Jose Loza, the CRO's "shot caller" outside of prison, or to David Gaitan, Loza's "right-hand man." Gaitan and Loza then transferred some of the collected funds to "secretaries," who covertly transmitted money from the CRO to the prison account of David Gavaldon, the CRO's incarcerated leader who was a member of the Mexican Mafia.

After a six-day trial, the district court denied Jaimez's motion to acquit, and the jury returned a guilty verdict on all charges. The district court denied Jaimez's renewed motion to acquit and his motion for a new trial. The district court sentenced Jaimez to 200 months in prison on each count, to run concurrently. Jaimez timely appeals.

## II

"When the issue of sufficiency of the evidence is preserved by making a motion for acquittal, we review the district court's denial of the motion de novo." *United States v. Jackson*, 24 F.4th 1308, 1311 (9th Cir. 2022) (citation omitted). We "view[] the evidence in the light most favorable to the prosecution, [asking whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Perez*, 962 F.3d 420, 446 (9th Cir. 2020) (citation omitted). We review challenges to a district court's jury instructions for plain error when, as here, the defendant did not object below. *United States v. Begay*, 33 F.4th 1081, 1088 (9th Cir. 2022) (en banc).

## A

We first address Jaimez's challenge to the sufficiency of the evidence for his conviction for conspiracy to distribute a controlled substance (methamphetamine), in violation of 21 U.S.C. § 846. To convict a defendant for this offense, the government must prove beyond a reasonable doubt that "(1) there existed an agreement between two or more persons to possess with intent to distribute or to distribute [the controlled substance]; and (2) [the defendant] joined the agreement knowing of its purpose and intending to help accomplish that purpose." *Perez*, 962 F.3d at 444.

Jaimez does not seriously dispute that the CRO distributed methamphetamine, of which there was overwhelming evidence. Instead, Jaimez argues there was insufficient evidence that he joined the gang's drug distribution conspiracy knowing and intending to help accomplish its purpose. We disagree.

"Once the existence of the conspiracy is shown," knowledge of its purpose can be established by proving beyond a reasonable doubt that there was a knowing, if "slight," connection between the defendant and the conspiracy. *United States v. Collazo*, 984 F.3d 1308, 1319 (9th Cir. 2021) (en banc) (citation omitted). A "slight" connection can be "inferred from circumstantial evidence," and the government need not prove the defendant knew all the conspirators and details or participated in all the conspiracy's dealings. *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001); *see also Collazo*, 984 F.3d at 1319 n.8. At minimum, the government must prove the defendant (1) "knew or had a reason to know of the scope of the conspiracy and . . . had reason to believe that [his] own benefits were dependent on the success of the entire venture"; and (2) "inten[ded] to effectuate the object of the conspiracy." *Collazo*, 984 F.3d at 1319 (citations omitted).

We conclude that sufficient evidence connected Jaimez to the drug distribution conspiracy and established his knowledge of its scope. *See Collazo*, 984 F.3d at 1319. An admitted CRO member, Jaimez regularly discussed drugs, violence, and extortionate "taxes" with other members; praised an incarcerated CRO member for successfully dealing drugs in prison; asked that dealer how to make "happy cards"; and was put in touch with another CRO member to learn how to do so. Viewed in the light most

favorable to the prosecution, this evidence is more than sufficient to establish a "slight" knowing connection between Jaimez and the drug distribution conspiracy. The evidence likewise provides a sufficient basis to infer that Jaimez knew of the conspiracy's scope and object.

In addition, the government presented sufficient evidence that Jaimez acted to further the conspiracy, intended to effectuate its purpose, and sought to benefit from its success. *See Collazo*, 984 F.3d at 1319. Jaimez agreed to Gaitan's orders to collect extortionate taxes, and to help another CRO member collect in a new area. When someone failed to pay Gaitan, Jaimez was willing to "sock[]" that person "in the face."

Expert testimony characterized Jaimez's actions as those of a "foot soldier," who understood that most of the taxes he agreed to collect came from drug distribution. And the record showed that Jaimez would personally profit from the drug activities, including potentially through receipt of a firearm. Together, this was ample evidence for a jury to find that Jaimez knew the money he agreed to collect came from illegal drug sales, knew that he would personally benefit from the conspiracy, and intended to effectuate its purpose. Jaimez protests that he was never found to possess illegal narcotics. But to convict Jaimez of drug distribution conspiracy, such proof is not necessary. We therefore affirm Jaimez's conviction for conspiracy to distribute a controlled substance.

## B

We now turn to Jaimez's challenge to his conviction for money laundering conspiracy. Money laundering requires a financial transaction using proceeds knowingly derived from unlawful activity "for the purpose of either promoting an

unlawful activity or for concealment." *United States v. Grasso*, 724 F.3d 1077, 1090 (9th Cir. 2013); *see also* 18 U.S.C. § 1956(a)(1). To convict an offender of money laundering conspiracy, 18 U.S.C. § 1956(h) requires the government to prove the following elements beyond a reasonable doubt:

> (1) There was an agreement to commit money laundering. *See United States v. Kimbrew*, 406 F.3d 1149, 1152 (9th Cir. 2005); *United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008).

> (2) The defendant knew the objective of the agreement. *See United States v. Moreland*, 622 F.3d 1147, 1169 (9th Cir. 2010).

> (3) The defendant joined the agreement with the intent to further its unlawful purpose. *See Collazo*, 984 F.3d at 1319.

*See also United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013). We first address Jaimez's challenge to the sufficiency of the evidence on the money laundering conspiracy charge, and then take up an issue relating to the jury instructions.

1

At trial, the government presented overwhelming evidence that the CRO engaged in money laundering by transferring extortionate "taxes" collected by foot soldiers to incarcerated gang leaders. Jaimez does not dispute that the CRO conspired to launder money into prison accounts. But he argues that the government failed to prove that Jaimez

himself knew of and intended to support the CRO's money laundering. Viewing the evidence in the light most favorable to the government, *Perez*, 962 F.3d at 446, we conclude that sufficient evidence supported Jaimez's money laundering conspiracy conviction. To explain why, we examine in some detail the government's evidence bearing on Jaimez's knowledge of the conspiracy.

The government demonstrated that the CRO was led by a Mexican Mafia member and that it was critical to the gang's operations that foot soldiers collect taxes and pay them (via "secretaries") to their Mexican Mafia kingpin, here Gavaldon. The government introduced testimony from almost two dozen witnesses and played in open court recordings of calls between various CRO members, Jaimez included. Some of the witnesses interpreted statements made in the recorded calls. Collectively, the government's evidence permitted a reasonable jury to conclude that foot soldiers like Jaimez were tasked with, among other things, collecting "taxes" and funneling the money upward through the CRO, where portions of it eventually reached incarcerated Mexican Mafia members like Gavaldon. Based on this evidence, a reasonable jury could infer that Jaimez knew of and intended to support the gang's money laundering activities.

The government's expert on the Mexican Mafia, former member Rene Enriquez (still incarcerated), testified that the Mexican Mafia was principally a prison gang and that most of its leaders were in prison and operated from there. Enriquez further explained that the Mexican Mafia instituted an extortionate "tax" program in the 1990s to make money and extend its influence beyond prisons. Enriquez told the jury that the central feature of the tax program was that representatives of the Mexican Mafia would "extort their

own gangs and drug territories" and funnel a portion of the proceeds to Mexican Mafia members—many of whom were incarcerated. Enriquez described how the Mexican Mafia was "entirely financial" and "about making money from drugs." He explained that gangs like the CRO have "the autonomy to tax drug dealers" on behalf of the Mexican Mafia, "keeping a portion of that money and sending the other portion to you," *i.e.*, the incarcerated Mexican Mafia member in charge of the gang. In this case, that was Gavaldon, who was incarcerated at Pelican Bay State Prison.

Officer Robert Rodriguez, formerly of the Whittier Police Department, also testified at trial. Officer Rodriguez, who was familiar with the CRO because of its operations in his jurisdiction, explained that the CRO derived its authority over its territory from Gavaldon, who controlled the organization. He discussed how CRO members were required to "put in work" to remain in good standing and enhance their reputations within the gang. Officer Rodriguez further testified that to communicate the source of the taxing authority, CRO members "use the name of the leader of CR, the Mexican Mafia gang member, David Gavaldon" when collecting taxes. Once CRO members collect taxes, they "get paid up to the gang member or the leader, in this instance David Gavaldon," but they are first given to either Loza or Gaitan.

The government also played a recorded call between Loza, the CRO's leader on the street, and a foot soldier named Ian Casillas, who was indicted alongside Jaimez. Although Jaimez was not a party to this call, it is still evidence of the overall structure of the CRO, the role of foot soldiers, and foot soldiers' general familiarity with the CRO's money laundering scheme. Casillas, like Jaimez, was described at trial as someone who "collected taxes" and

"[c]ommitted acts of violence for the gang." In the recorded call, Loza repeatedly demanded that Casillas provide the gang his "tax" money, emphasizing that because Loza had not received Casillas's money, Loza had been forced to pay Gavaldon out of his own pocket.

Michael Castrilla, a special agent in the Department of Homeland Security, testified that in this call, Loza was reinforcing for Casillas that the tax money was ultimately owed to Gavaldon. On the call, Casillas acknowledged the need to collect taxes and pay a portion to Gavaldon. Several months earlier, Casillas had been recorded talking to Gaitan about how he was going to drop off some tax proceeds in Gaitan's mailbox. Agent Castrilla explained that foot soldiers like Casillas and Jaimez would collect taxes and give them to Gaitan, who would turn them over to Loza, who would then "pass that money up to Gavaldon through his secretaries." The Casillas call, then, demonstrates Loza's clear communication of the purpose of collecting taxes to a foot soldier similarly situated to Jaimez.

Agent Castrilla also testified about another recorded call between Donald Goulet and Gaitan. Goulet, too, was indicted alongside Jaimez, and Jaimez was in contact him about collecting taxes. Goulet was also "the primary point of contact . . . for collecting taxes from the Riverside gang." Once again, although Jaimez was not a party to this call, it is further evidence of the structure and functioning of the CRO, as well as the role and knowledge of a foot soldier.

In this call, Goulet relayed to Gaitan how when he was collecting taxes, he had told another man that he was "working for Spider from CR," meaning Gavaldon (who was nicknamed "Spider"). Gaitan explained to Goulet that, to better convey the authority for his tax collection efforts, "when it's the right time, and you say Spider, you know, you,

you should probably say Spider from . . . I mean, yeah, he's from our hood but he's from somewhere else now, you know what I mean?" Agent Castrilla explained that by this, Gaitan meant that Gavaldon was not just from the CRO but was also a member of the Mexican Mafia. Agent Castrilla thus testified that Gaitan was instructing Goulet to make clear when he was collecting taxes that he was doing so on behalf of a Mexican Mafia member.

The recorded calls between Loza, Gaitan, Casillas, and Goulet, combined with the testimony of Officer Rodriguez and Agent Castrilla, show that a core responsibility of the foot soldiers was to obtain money in the form of "taxes," so that portions could be passed on to incarcerated Mexican Mafia leaders, here Gavaldon. Indeed, the recorded conversations often featured coded language designed to disguise the origins of the laundered funds, and thus to obscure the nature of the money laundering operation. *See United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) (explaining that a jury could infer participation in a money laundering conspiracy because "the defendants would communicate about the transactions in coded language"). This is not a matter of imputing the knowledge of others to Jaimez, as the dissent maintains, but of drawing reasonable inferences, in combination with the rest of the evidence, about what Jaimez likely would know based on what others with similar roles to Jaimez clearly knew.

Further supporting this is the fact that Jaimez, too, was both mentioned in recorded calls and recorded engaging in extensive conversations with Gaitan, including about collecting taxes. On June 26, 2013, Gaitan called one of Jaimez's brothers, Steven, and asked him whether he and Jaimez would go to Riverside, a new territory for the CRO, to help Goulet collect taxes. Gaitan told Steven that he does

not "like anybody being outmanned and outgunned." Steven assured Gaitan that Jaimez and others were already on their way to help Goulet. Agent Castrilla testified that, based on the recorded call, Jaimez and others were going to help Goulet "collect taxes from Riverside area gangs on behalf of David Gavaldon."

The following day, June 27, Jaimez was recorded informing Gaitan that he got "the rundown" from Goulet on collecting taxes. (Although Jaimez does not mention Goulet at this part of the recording, another recorded call between Gaitan and Jaimez's brother Steven shows that Jaimez was going to meet Goulet on June 26 to "help" him out with "collect[ion]" in Riverside, which would allow the jury to infer that Jaimez was referring to Goulet in his June 27 recorded call). During the June 27 call, Gaitan told Jaimez that he "want[ed] to go collect" and "get the *feria*," or money, even if that required violence. Jaimez promptly agreed.

In combination with the other evidence discussed above, a jury could reasonably infer that Jaimez knew taxes he was collecting were destined in part for Gavaldon in prison. The jury would not simply be imputing Goulet's knowledge to Jaimez, but rather would be inferring from Jaimez's contacts with Goulet and other CRO members, and the structure of the CRO generally, that Jaimez was aware that collected taxes would be funneled to the Mexican Mafia in prison. *See United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) (explaining that it "is settled law" that intent "may be established by circumstantial evidence" and that a "jury may infer intent"); *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003) (noting circumstances from which a "jury can infer knowledge").

Further supporting this is the fact that on many of his recorded calls, Jaimez referenced his interactions with at least nine other CRO members, including Goulet. And three of Jaimez's brothers were also CRO members who were indicted alongside him. From Jaimez's contact with these other gang members, in combination with the evidence discussed above, including the clear knowledge of Goulet and Casillas about the purpose of the CRO's tax collection, a jury could reasonably infer that Jaimez knew the reason for his activities, too.

In response, Jaimez points out that he was never recorded explicitly agreeing to launder money. The dissent makes a similar point in noting the absence of evidence of Jaimez's own words or statements demonstrating his knowledge of the money laundering conspiracy. But a jury could still reasonably infer that Jaimez knew of the conspiracy and intended to support its unlawful purpose. "Smoking gun" incrimination is not a requirement for a money laundering conspiracy conviction. As we explained in *United States v. Wright*, 215 F.3d 1020 (9th Cir. 2000), "the government need not prove knowledge with direct evidence; circumstantial evidence and the inferences drawn from that evidence can sustain a conspiracy conviction." *Id.* at 1028. We further noted that after "the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt even a slight connection of a defendant with the conspiracy is sufficient to convict the defendant of knowing participation." *Id.* Indeed, we have long held that conspiracies can be proven based on the reasonable inferences drawn from circumstantial evidence. *See, e.g.*, *United States v. Thomas*, 887 F.2d 1341, 1347–48 (9th Cir. 1989); *United States v. Miranda-Uriarte*, 649 F.2d 1345, 1352 (9th Cir. 1981).

While the government's closing argument is not evidence, *see Runningeagle v. Ryan*, 686 F.3d 758, 777 (9th Cir. 2012), it is useful to consider in evaluating both the permissible inferences that can be drawn from the evidence and how the government built its money laundering conspiracy case against Jaimez. The government began its closing argument by quoting one of Jaimez's recorded calls with Gaitan and explaining that Jaimez agreed "to collect outstanding taxes that were owed to the enterprise," arguing that this was "what the enterprise, the Canta Ranas organization, was all about." The government further argued that the CRO's drug trafficking activities were "all to make money, to generate profits for their leader, Mexican Mafia member David Gavaldon." The government repeated that the crimes Jaimez had committed were "all on behalf of David Gavaldon and the Canta Ranas organization."

The government also argued that the role of foot soldiers like Jaimez was to "put in work in order to raise themselves in the organization's hierarchy," including by collecting taxes. The government recapped the key evidence against Jaimez, including that he and Goulet collected taxes together, with Goulet explicitly stating that he did so on behalf of Gavaldon. Ultimately, the government argued that Jaimez "played an integral part in this money laundering scheme" because he "was one of the people who collected the money from these illegal activities and then sent it up the chain so that it could eventually make its way to David Gavaldon."

Given all this evidence, we do not think it plausible that the jury convicted Jaimez based on his "mere gang membership" alone. *See Perez*, 962 F.3d at 445 (citing *United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011)). In *Perez*, we upheld a conspiracy conviction

because the "evidence [was] sufficient for rational jurors" to conclude that the defendant "was a core member of [the gang's] drug-trafficking operation," just as Jaimez was a core member of the CRO's money laundering operation. *Id.* It is true that in *Bingham*, on which *Perez* relied, we cited *United States v. Garcia*, 151 F.3d 1243, 1246 (9th Cir. 1998), for the proposition that "mere gang membership 'cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs.'" 653 F.3d at 997. But *Bingham*, which affirmed the conspiracy convictions in relevant part, distinguished *Garcia*, explaining that there "the government failed to prove the existence of an agreement among the defendant and Bloods gang members to shoot members of the Crips gang." *Id.* at 998. Only in *Garcia*—where the government's theory rested entirely on the generalized notion that gang members agree to attack members of a rival gang simply by virtue of their gang membership—did we reverse on the theory that mere gang membership is not sufficient to sustain a conspiracy conviction. 151 F.3d at 1246–47.

Properly considered, *Perez*, *Bingham*, and *Garcia* all support the government here. The government introduced extensive evidence that Jaimez was an active participant in the CRO's activities, including its money laundering operation, and that these activities went well beyond mere gang membership or affiliation. Our "mere gang membership" cases do not require us to limit the reasonable inferences that a jury may draw from the government's evidence. That includes the inference that because similarly situated gang members like Goulet and Casillas knew of the money laundering, Jaimez knew of the money laundering, too, especially when Jaimez was in close contact with Goulet and many of his other co-conspirators.

Nor was the jury required to accept Jaimez's argument that, notwithstanding his diligent membership in a tightly controlled gang premised on a hierarchical management structure led by an imprisoned boss, he was unaware that extorted taxes were being passed on to incarcerated gang leadership. On the facts presented at trial, that Jaimez may have operated at a lower rung of the gang's structure did not preclude a rational jury from finding that he possessed the requisite knowledge of the CRO's money laundering objectives. Indeed, the entire modus operandi of the CRO was to collect extortionate taxes and send the money up the chain. The dissent's assertion that the government did not present "any" circumstantial evidence that Jaimez knew or agreed to the money laundering conspiracy is therefore plainly incorrect.[2]

In short, given the evidence presented at trial, a jury could reasonably find that a central purpose of the CRO was to illegally funnel money to incarcerated gang leaders. And a jury could likewise reasonably conclude that Jaimez knew of and intended to further the money laundering conspiracy, *see Collazo*, 984 F.3d at 1319, without convicting him solely on the basis of his CRO membership.

2

Jaimez next challenges the jury instructions as they relate to the money laundering conspiracy charge. He does not challenge the instructions specific to money laundering but argues that the district court erred by instructing the jury, in

---

[2] We also do not suggest, as the dissent maintains, that our holding here means there will always be sufficient evidence to convict any CRO member of money laundering. Our conclusion is instead based on the facts of this case and the evidence presented at trial.

the course of generally defining the term "knowingly," that the government was "not required to prove that the defendant knew that his acts or omissions were unlawful." Jaimez maintains that this standard instruction could have allowed jurors to convict him of money laundering conspiracy even if they did not believe the government had proven that at least some of the laundered proceeds were unlawfully obtained. *See United States v. Lonich*, 23 F.4th 881, 899 (9th Cir. 2022) (noting that an element of money laundering is that the defendant "knew the transactions involved criminally derived property" (quotations omitted)).

Because Jaimez did not object to the district court's instruction below, we review for plain error. *See United States v. Macias*, 789 F.3d 1011, 1017 (9th Cir. 2015). To show plain error, Jaimez "must demonstrate: (1) error; (2) that is clear or obvious; (3) that affects the defendant's substantial rights; and (4) that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotations omitted). For an error to be prejudicial, there must be "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *Alghazouli*, 517 F.3d at 1190 (quotations and alterations omitted). Because we conclude that Jaimez has failed to demonstrate that the alleged error affected his substantial rights, let alone seriously affected the fairness, integrity, or public reputation of his judicial proceedings, we need not decide whether he has established a clear or obvious instructional error.

As we recounted above, there was ample evidence showing that Jaimez was aware of the CRO's drug trafficking activities and that he was directly involved in extortion and collecting "taxes" from drug distribution. The district court also properly instructed the jury as to the

substantive elements of money laundering, including the required knowledge of the unlawful origin of laundered proceeds. *See Lonich*, 23 F.4th at 899.

Given the evidence of Jaimez's role in the CRO's activities and the unchallenged money laundering instructions, the jury could easily conclude that Jaimez knew that at least some of the funds involved in the CRO's money laundering operation were unlawfully obtained. Jaimez has not demonstrated a reasonable probability that, absent the disputed "knowingly" instruction, the outcome of his proceedings would have been different. *See Alghazouli*, 517 F.3d at 1190. Jaimez therefore has not shown that the alleged error affected his substantial rights or seriously affected the fairness, integrity, or public reputation of his judicial proceedings. *See Macias*, 789 F.3d at 1017.

C

Jaimez also challenges his RICO conspiracy conviction under 18 U.S.C. § 1962(d), arguing that it must be set aside if any of the predicate racketeering acts lacked sufficient evidence. As relevant here, to establish Jaimez's guilt for RICO conspiracy, the government had to present "adequate proof of an overall conspiracy to participate, directly or indirectly, in the conduct of the [enterprise's] affairs through a pattern of racketeering." *United States v. Fernandez*, 388 F.3d 1199, 1226 n.18 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005); *see also* 18 U.S.C. § 1962(c).

A pattern of racketeering activity requires proving at least two predicate acts of racketeering. 18 U.S.C. § 1961(5). "[P]redicate racketeering acts that are themselves conspiracies may form the basis for a charge and eventual conviction of conspiracy under § 1962(d)." *Fernandez*, 388 F.3d at 1259; *see also United States v. Rodriguez*,

971 F.3d 1005, 1013 (9th Cir. 2020). For a RICO conspiracy conviction, the government need not prove that the defendant himself performed the predicate acts. *Salinas v. United States*, 522 U.S. 52, 65–66 (1997).

The general verdict form for Jaimez's RICO conspiracy charge did not specify the underlying predicate acts found by the jury. But the jury was presented with three possible predicate acts to establish a pattern of racketeering: (1) drug distribution conspiracy, (2) money laundering conspiracy, and (3) extortion, including attempt and conspiracy to extort. Because we have concluded that there was sufficient evidence for the drug distribution and money laundering conspiracies, it follows that at least two RICO predicates have been sufficiently established for purposes of the RICO conspiracy conviction.

But even if there were insufficient evidence for the money laundering conspiracy conviction, we would still uphold Jaimez's RICO conspiracy conviction because extortion serves as another sufficient predicate act. *See* 18 U.S.C. § 1961(1) (providing that predicate racketeering acts include extortion under state law that is punishable by imprisonment for more than one year). We agree with the government that there was sufficient evidence of extortion, including conspiracy and attempt to commit extortion. The evidence showed that Jaimez knew the CRO collected money from unwilling sources, was ready to use violence to collect money, and understood the money went to the gang. Whether or not the government established that Jaimez himself extorted money on any specific occasion, it is clear he agreed to do so and knew others were doing so, and that he intended to help. Recorded phone conversations involving Jaimez, his brother Michael (also a CRO member), and Gaitan, viewed in the light most favorable to the

prosecution, *Perez*, 962 F.3d at 446, establish that Jaimez took direct acts to further the conspiracy. And we know drug distribution conspiracy was one of the predicate acts found by the jury because of the verdict form's special question regarding drug quantity.

Jaimez argues, based on *United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995), that his RICO conspiracy conviction must be reversed if at least one of the predicate acts of racketeering is not supported by sufficient evidence. In *Manarite*, we reversed a conspiracy conviction under 18 U.S.C. § 371, which requires proof of at least one underlying object, because two of the objects presented to the jury were legally infirm and it was impossible to determine from the general verdict form whether the jury based the conviction on a legally infirm basis. *Id.* at 1413–14. But in *United States v. Choy*, 309 F.3d 602 (9th Cir. 2002), we clarified that a different rule applies when one of the objects is only *factually*, but not legally, insufficient:

> Where substantive offenses underlying a conspiracy conviction are successfully challenged, the reason for reversal affects the viability of the conspiracy conviction . . . . [T]he conspiracy conviction must be overturned if the conviction on [either] substantive count . . . was the result of "legal error." If, on the other hand, the government merely failed to introduce sufficient evidence to sustain guilt on either [substantive count], then the conspiracy conviction can stand on the theory that the jury found a conspiracy to commit the other offenses for which there was sufficient evidence.

*Id.* at 605 (footnote omitted) (citing *Griffin v. United States*, 502 U.S. 46, 59 (1991)); *see also United States v. Gonzalez*, 906 F.3d 784, 790–91 (9th Cir. 2018).

In *Griffin*, the Supreme Court affirmed a conspiracy conviction under § 371, despite insufficient evidence for one of the possible underlying objects, because the invalid object was still legally sufficient, and the remaining object on which the verdict could have rested was factually and legally sufficient.  502 U.S. at 56–59.  *Griffin* reasoned that when two alternative objects of a conspiracy are presented, and one object lacks sufficient evidence, a jury can be trusted to convict on the basis that was factually supported.  *Id.* at 59; *see also Gonzalez*, 906 F.3d at 791 (noting that jurors are not "expected to recognize . . . legal deficiency," but "'*are* well equipped to analyze the evidence,' [so] we can be confident that the jury chose to rest its verdict on the object that was supported by sufficient evidence, rather than the object that was not" (quoting *Griffin*, 502 U.S. at 59)).

*Griffin*'s reasoning applies to RICO conspiracy convictions under 18 U.S.C. § 1962(d).  *See United States v. Browne*, 505 F.3d 1229, 1261 (11th Cir. 2007) ("We have never applied *Griffin* in this particular RICO context, but we see no reason why its rationale does not apply here." (citing *United States v. Vastola*, 989 F.2d 1318, 1330 (3d Cir. 1993)).  Here, the jury was presented with three legally sufficient predicate racketeering acts.  So even if there had been insufficient evidence for money laundering conspiracy (there was not), the RICO conviction would still stand because there was clearly sufficient evidence for the other two valid predicate activities—drug distribution conspiracy and extortion.  *See Griffin*, 502 U.S. at 58–59; *Gonzalez*, 906 F.3d at 790–91.   We thus affirm Jaimez's RICO conspiracy conviction.

* * *

For these reasons and those set forth in our accompanying memorandum disposition, the judgment of the district court is

**AFFIRMED.**

---

OWENS, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II.A of the majority opinion, along with most of Part II.C.  But the evidence does not show, even in the light most favorable to the government, that Alexis Jaimez knew the objective of the money laundering conspiracy or joined with the intent to further its purpose. Thus, I respectfully dissent from Part II.B and the sections of Part II.C that imply otherwise.

## I.

I agree with the majority that to sustain Jaimez's conviction for money laundering conspiracy, under 18 U.S.C. § 1956(h), the government had to prove three elements beyond a reasonable doubt:  (1) there was an agreement to commit money laundering; (2) the defendant knew the objective of the agreement; and (3) the defendant joined the agreement with the intent to further its unlawful purpose.  Majority Opinion 10.

And I agree that the government established the first element of the § 1956(h) conviction.  The evidence showed that CRO leaders conspired to take proceeds collected by foot soldiers from extortionate taxes and drug sales, and then

transmit some of that money to Gavaldon's prison account, while concealing the source of funds.

But even reviewing the evidence in the light most favorable to the government, *see United States v. Perez*, 962 F.3d 420, 446 (9th Cir. 2020), the evidence does not establish the second or third elements of § 1956(h) beyond a reasonable doubt. The government had to prove that Jaimez knew the purpose of the money laundering agreement was to conduct a financial transaction (sending money to incarcerated members like Gavaldon), and that the transaction was intended to conceal the unlawful sources of the funds (extortion and drug distribution). *See* § 1956(a)(1) (outlining elements of money laundering). But the evidence introduced at trial does not show that Jaimez, in his role as a low-ranking foot soldier, either knew that objective or joined the money laundering agreement with the intent to further its purpose.

To be sure, the trial record shows that Jaimez was a really bad guy who committed serious crimes, including extortion and drug dealing. Majority Opinion 15, 22–23. And the government proved that Jaimez knew and talked with CRO members, including his brothers, Majority Opinion 11, 14–16, and that certain CRO members (but not Jaimez) knew the gang was structured to transmit money to incarcerated gang leaders, Majority Opinion 10–14, 19. The majority opinion and the government assert this was sufficient circumstantial evidence to prove that Jaimez knew about and agreed to participate in the elaborate conspiracy funneling gang funds into prisons. But none of this evidence—not the recorded phone calls, the expert testimony interpreting the calls, or the witness testimony about CRO's structure—showed that *Jaimez* knew the money was transferred from Gaitan to Loza

to the gang secretaries and to Gavaldon, all with the intent to conceal the source of funds. *See* 18 U.S.C. § 1956(a), (h).

The government did not need to prove Jaimez's knowledge of the conspiracy's objective through direct evidence. *See United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000). But showing that some other person knew about the conspiracy is not sufficient "circumstantial evidence" of Jaimez's knowledge—indeed, the majority's own cited cases show that evidence specific to the charged defendant is required to prove knowledge. *See* Majority Opinion 16 (first citing *United States v. Thomas*, 887 F.2d 1341, 1347–48 (9th Cir. 1989) (affirming conviction where knowledge of and assent to the conspiracy was established through witness testimony that the *defendant's own words* alluded to knowing his actions were illegal and furthered the goal of the conspiracy); and then citing *United States v. Miranda-Uriarte*, 649 F.2d 1345, 1352 (9th Cir. 1981) (relying on the *defendant's own statements* regarding his knowledge of the drug conspiracy and his presence at the scene of the drug sale to affirm conspiracy conviction)); *see also Wright*, 215 F.3d at 1028 (concluding the defendant knew of the conspiracy because *his DNA* was found at the scene). Here, the government did not present any evidence—circumstantial or otherwise—specifically showing Jaimez's knowledge.

Tellingly, even the government's opening statements and closing arguments at trial did not assert that Jaimez knew the money would be laundered. Indeed, the closing argument focused almost entirely on CRO's structure and the evidence against Jaimez's co-defendant; the prosecutor pointed only to general statements about gang members and to Jaimez's violent past and conversations about drugs. At trial and in their briefs to this court, the government also

cited a conversation that shows Goulet clearly knew about and agreed to the money laundering conspiracy—but the government cannot impute someone else's knowledge to Jaimez to prove his knowledge beyond a reasonable doubt.[1]

Due to the lack of specific evidence showing Jaimez's knowledge, the majority concedes his § 1956(h) conviction rests on the inference that he must have known about the conspiracy because other CRO members he interacted with knew about the conspiracy's objective and knew the gang was structured to support the conspiracy. *See* Majority Opinion 10–11, 13, 17–19 (inferring from Jaimez's connections that he knew of the conspiracy, and conceding Jaimez was not party to the conversations linking the gang funds to Gavaldon). But this tacks too closely to our long-standing precedent that mere gang membership and affiliation with gang members is not enough to make out a conspiracy conviction. *See Perez*, 962 F.3d at 445; *see also United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir.

---

[1] The majority opinion and the government make a lot out of a recorded phone call where Jaimez purportedly admits to getting the "rundown" about tax collection from Goulet. But that part of the conversation does not reference Goulet, despite the majority's insistence that the jury could infer otherwise. Majority Opinion 14–15. And the only part of the call that mentions Goulet does not suggest that Jaimez knew tax money was funneled to Gavaldon:

> Gaitan: Mmm, uh-uh. You haven't talked to no one else?
>
> Jaimez, A: Nah, no one else. Just Wacky [Goulet] . . . this and that issue and then, that's it. Oh, and then, and then—like he, he basically said, it was like a waiting game right there, and I was like thinking like—does he think I'm gonna wait with him right here, or like—til he gets a call or whatever, you know?

1980) ("[T]here can be no conviction for guilt by association, and it is clear that mere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator."). Indeed, if this evidence were sufficient to convict Jaimez of money laundering conspiracy, it would be sufficient to convict any other CRO member. That sweeping result devours the rule in *Perez*.

## II.

At the end of the day, the government proved that Jaimez agreed to collect extortionate taxes, that CRO's leaders funneled money to incarcerated members, and that certain members of the enterprise conspired to launder money. But the government did not prove that *Jaimez* conspired to launder money because it did not present any evidence, circumstantial or direct, that he knew about or agreed to the laundering conspiracy.

Jaimez did many awful things, and he was rightly convicted of serious federal crimes. But the career criminal is not guilty of all crimes. Because the government did not meet its burden to prove each element of the § 1956(h) conviction beyond a reasonable doubt, I would vacate that conviction.[2]

For these reasons, I respectfully dissent in part.

---

[2] Because I do not believe there is sufficient evidence to sustain Jaimez's conviction for money laundering conspiracy, I do not reach the jury instructions issue addressed in Part II.B.2 of the majority opinion.